**EXAMINATION MANAGEMENT SER-
VICES, INC., a Texas Corporation,
Appellant (Plaintiff),**

v.

**Norman KIRSCHBAUM, individually and
d/b/a Western Medical Services, Inc., a
Wyoming Corporation, Appellee (Defen-
dant).**

No. 95–278.

Supreme Court of Wyoming.

Nov. 1, 1996.

Kim D. Cannon and Anthony T. Wendtland of Davis & Cannon, Sheridan; Bruce Willoughby of Brown, Drew, Massey & Sullivan, Casper, for appellant.

Mark W. Gifford of Gifford & Bonner, Casper, for appellee.

Before GOLDEN, C.J., and THOMAS, MACY, TAYLOR *, and LEHMAN, JJ.

* Chief Justice effective July 1, 1996.

GOLDEN, Justice.

In this contract dispute, in which each party charged the other with having breached the contract and one party accused the other of having wrongfully interfered with the former's contractual relationships with third-parties, we are presented with a question of interpretation concerning the scope of the services to be performed under the contract, a question of the validity of the claim of interference with contractual relationships, and questions of the sufficiency of the evidence supporting the jury's verdict. Before trial, the district court granted a partial summary judgment in favor of Norman Kirschbaum, the party providing the services under the contract, ruling that the contract unambiguously limited the scope of Kirschbaum's services to services, including occupational health testing, for insurance company clients of Examination Management Services, Inc. (EMSI). At the conclusion of the trial, finding in favor of Kirschbaum on his claims of breach of contract and interference with contractual relationships, the jury awarded him substantial damages against EMSI. EMSI appeals both the district court's partial summary judgment order and the judgment entered on the jury's verdict.

We affirm.

EMSI presents these issues:

A. Did the District Court Commit Reversible Error In Awarding Partial Summary Judgment to Kirschbaum On His Claim that OHT Services Were Outside of the Plain Meaning of the Parties' Contract?

B. Were Kirschbaum's Damage Claims For Alleged Interference With Independent Examiner Contracts Valid As A Matter of Law?

C. Were The Jury's Damage Awards For Intentional Interference With At Will Contracts And Breach of Contract Supported By Sufficient Evidence?

Kirschbaum rephrases the issues in this way:

1. Do the materials submitted to the district court on motions for summary judgment show the existence of any genuine

issue of material fact as to the scope of the contract?

2. Is Kirschbaum's claim for intentional interference with contractual relations valid under Wyoming law?

3. Is the jury's damage award supported by substantial evidence?

Although the specific facts surrounding the issues presented will be set forth in more detail as we discuss each issue below, we state the following general facts to provide an understanding of the procedural history of this case. On September 5, 1990, EMSI and Kirschbaum entered into a written contract of five years duration under the terms of which Kirschbaum, under EMSI's name, was to furnish what may be generally described at this time as medical and paramedical examination services to EMSI's approved customers. Without going into detail at this time about the parties' respective performances under the contract between September 5, 1990, and May 1993, we can say that in early May 1993, EMSI notified Kirschbaum that it was terminating the contract for cause because of certain of Kirschbaum's activities. EMSI believed that Kirschbaum's activities constituted a breach of the contract. A few days after this notification, EMSI filed suit against Kirschbaum, seeking enforcement of a non-competition provision in the contract, return of EMSI equipment and money damages for sums that Kirschbaum allegedly owed EMSI.

Kirschbaum filed an answer denying EMSI's claims and a counterclaim alleging that EMSI breached the contract and wrongfully interfered with contractual relationships existing between Kirschbaum and independent examiners he used in performing the services under the contract. The parties engaged in discovery. On March 28, 1995, EMSI filed a motion for summary judgment on three of Kirschbaum's counterclaims, viz., wrongful termination of the contract, slander and defamation, and intentional interference with contractual relationships. Specifically with respect to the wrongful termination claim, EMSI supported its motion with the contract and excerpts of testimony from Kirschbaum's deposition taken on September 22 and 23, 1993. The thrust of EMSI's

motion on that particular claim was that Kirschbaum's deposition excerpts showed that Kirschbaum had directly billed some clients, instead of billing them through EMSI, in violation of one of the contract's provisions. EMSI reasoned that its termination of the contract because of Kirschbaum's "direct billing" violation was, therefore, lawful and not wrongful as Kirschbaum alleged.

On April 13, 1995, Kirschbaum countered EMSI's summary judgment motion with his own motion for partial summary judgment. In support of his motion, Kirschbaum submitted nine exhibits, including the contract and his affidavit dated April 12, 1995. The thrust of Kirschbaum's motion was that the contract unambiguously applied only to his furnishing insurance physical examination services, not occupational health testing services; Kirschbaum later developed a market for occupational health testing services; he encountered problems with EMSI's handling of his occupational health testing services accounts; he began direct billing his own occupational health testing services accounts; EMSI terminated the subject contract because of his direct billing of his own occupational health testing services accounts; and, because those accounts were outside the scope of the parties' contract, EMSI's action terminating that contract was wrongful.

EMSI responded to Kirschbaum's motion for partial summary judgment on April 24, 1995, with a written memorandum which discussed certain provisions of the contract and certain portions of Kirschbaum's affidavit, as well as certain evidence relating to the parties' performances following the making of the contract. In this response, EMSI contended that the parties' performances after the making of the contract were sufficient to modify the contract to now include occupational health testing services. On April 27, 1995, Kirschbaum supplemented his motion for partial summary judgment with his second affidavit of that same date.

The district court heard argument on the parties' cross motions for summary judgment and also permitted them to amend their pleadings. Following those amendments and the parties' answers thereto, the district

court issued its decision on the summary judgment motions. The district court granted Kirschbaum's motion for partial summary judgment, ruling that the contract unambiguously limited the scope of Kirschbaum's services to services, including occupational health testing, for EMSI's insurance company clients. The district court denied summary judgment on the other issues presented by the parties' motions.

The parties tried the remaining issues to a jury. The jury found against EMSI on its claim that the parties' performances modified the original contract to include occupational health testing services for non-insurance company clients. The jury found that EMSI had breached the contract, and awarded Kirschbaum $100,000 damages. The jury also found that EMSI had wrongfully interfered with Kirschbaum's contractual relationships with independent examiners, and awarded him $125,000 damages. Finally, the jury awarded Kirschbaum attorney's fees in the sum of $3,500. The district court entered judgment on the verdict and later denied EMSI's post-trial motions. EMSI appeals both the partial summary judgment and the judgment entered on the jury's verdict.

## DISCUSSION

*Partial Summary Judgment Issue—Scope of Services Under the Contract*

1. *Standard of Review.*

■ Our cases are legion in which we recite our summary judgment rules. The parties here agree what those rules are. The parties also agree that the contract in question is unambiguous, *i.e.,* it is capable of being understood in only one way, with respect to the scope of services that Kirschbaum was to furnish. The parties disagree, however, about that understanding; in other words, they disagree about the meaning of the contract with respect to the scope of services. We have held that "the parties' subsequent disagreement concerning the contract's meaning does not establish an ambiguity which would require resort to extrinsic evidence." *Moncrief v. Louisiana Land & Exploration Co.,* 861 P.2d 516, 524 (Wyo. 1993); *Cliff & Co., Ltd. v. Anderson,* 777 P.2d

595, 599 (Wyo.1989). The initial question of whether the contract is capable of being understood in only one way is a question of law for the court. *Prudential Preferred Properties v. J and J Ventures, Inc.,* 859 P.2d 1267, 1271 (Wyo.1993); *State v. Pennzoil Co.,* 752 P.2d 975, 979 (Wyo.1988). If the court determines that the contract is capable of being understood in only one way, then the language used in the contract expresses and controls the intent of the parties. *Pennzoil,* 752 P.2d at 978. In such case, the next question, what is that understanding or meaning, is also a question of law. *Treemont, Inc. v. Hawley,* 886 P.2d 589, 592 (Wyo. 1994); *Amoco Production Co. v. Stauffer Chemical Co. of Wyoming,* 612 P.2d 463, 465 (Wyo.1980). When we review the district court's summary judgment decisions that a contract is capable of being understood in only one way and what that understanding is, we accord no deference to those decisions. *Prudential Preferred Properties,* 859 P.2d at 1271. As we have said, "[w]e are ... at liberty to make a determination as to the existence of ambiguity whether or not the parties here agree thereto one way or the other, and whether or not the trial court has reached a conclusion thereon one way or the other." *Amoco Production,* 612 P.2d at 465.

■ Although we are an appellate court, we "must make this determination upon the basis of the same material as that before the trial judge." *Kuehne v. Samedan Oil Corp.,* 626 P.2d 1035, 1039 (Wyo.1981). If we, too, determine, as did the district court, that no doubt exists about the contract's meaning, that is a determination that no genuine issue of material fact exists to be litigated and, therefore, summary judgment is appropriate. *Kilmer v. Citicorp Mortgage, Inc.,* 860 P.2d 1165, 1167 (Wyo.1993). On the other hand, if we determine that doubt exists about the contract's meaning, that is a determination that a genuine issue of material fact exists to be litigated and, therefore, summary judgment is inappropriate. *Meuse–Rhine–Ijssel Cattle Breeders of Canada Ltd. v. Y–Tex Corp.,* 590 P.2d 1306, 1311 (Wyo.1979). Upon determining that summary judgment is inappropriate because the parties must litigate the meaning of the contract, we remand the case to the trial court for a trial in which

the parties may introduce evidence in addition to the contract, not to vary or alter the meaning of it, but to prove what that meaning is. *Madison v. Marlatt,* 619 P.2d 708, 714 (Wyo.1980).

When we as an appellate court consider the same material as that before the trial judge, as we undertake to determine the initial question of whether the contract is capable of being understood in only one way, we also follow the same standards as did the trial judge. *Moncrief,* 861 P.2d at 523. In the context of contract interpretation, those standards include:

—in reading a contract our primary purpose is to determine the true intent and understanding of the parties at the time and place the contract was made;

*Treemont, Inc.,* 886 P.2d at 593.

—we consider the contract as a whole, reading each part in light of all other parts; meaning should be afforded to all of the language used by the parties if that can be done and a reasonable construction achieved; in other words, we analyze "the tenor" of the contract;

*Moncrief,* 861 P.2d at 523–524; *Mobil Coal Producing, Inc., v. Parks,* 704 P.2d 702, 706 (Wyo.1985); *Leithead v. American Colloid Co.,* 721 P.2d 1059, 1063 (Wyo.1986).

—the presumption is that a particular provision is placed in a contract for a purpose; therefore, we strive to avoid a construction which renders a provision meaningless. Similarly, we strive to reconcile by reasonable interpretation any provisions which apparently conflict before adopting a construction which would nullify any provision;

*Moncrief,* 861 P.2d at 524; *Amoco Production,* 612 P.2d at 466.

—if we identify an ambiguous term or portion of the contract, we strive to ascertain the meaning of that term or portion from other language of the contract, *i.e.,* from the contract as a whole;

*Amoco Production,* 612 P.2d at 466.

—common sense and good faith are the leading characteristics of contract construction;

*Moncrief,* 861 P.2d at 524.

—we determine the parties' intent by an objective approach, *i.e.,* intention is what a reasonable person in the position of the parties would conclude the manifestations to mean.

*Wyoming Game and Fish Comm'n v. The Mills Co.,* 701 P.2d 819, 822 (Wyo.1985).

In addition to these standards, we have also recognized that:

[T]he language of a contract is to be construed within *the context* in which it was written. In so doing, the court may look to the surrounding circumstances, the subject matter and the purpose of the contract. The purpose of examining *the context* within which the contract was drawn, however, is limited to ascertaining the intent of the parties at the time the agreement was made. *The context* cannot be invoked to contradict the clear meaning of the language used, and those extraneous circumstances do not justify a court in proceeding "to insert therein a provision other than or different from that which the language used clearly indicates, and thereby, in effect, make a contract for the parties." *Snow v. Duxstad,* 23 Wyo. 82, 147 P. 174, 184 (1915).

*Pennzoil,* 752 P.2d at 978 (citations omitted and emphasis added); and *see Taylor v. State Farm Mutual Automobile Insurance Co.,* 175 Ariz. 148, 854 P.2d 1134, 1138–1141 (1993), *modified on other grounds,* 185 Ariz. 174, 913 P.2d 1092 (1996), and authority cited therein.

Keeping these standards in mind, we now turn to the first step in the process of determining whether the contract in question is capable of being understood in only one way, and that is, identifying the material which the parties submitted to the district court for consideration in connection with the summary judgment motions.

### 2. *Material Considered.*

The district court had the parties' contract before it and it is reproduced for this opinion in an appendix. We are satisfied that the district court also had before it certain extrinsic evidence. With respect to that extrin-

sic evidence, our task was to identify that evidence which pertained to the context in which the contract was written. Such context evidence would include the purpose of the contract and discussions between the parties before the contract was made. Although EMSI's summary judgment motion recited that it was based upon the pleadings, the depositions of EMSI's president John M. Utley and the opposing party Kirschbaum, and interrogatories and admissions filed in the action, our reading of EMSI's memorandum in support of the motion reveals that EMSI specifically referred to only a few excerpts from Kirschbaum's deposition, the sense of which was that he had directly billed some clients. None of the excerpts pertained to the context in which the contract was written.

In contrast, when Kirschbaum filed his counter motion for partial summary judgment, he submitted eight exhibits in addition to the contract. One of those eight exhibits, Kirschbaum's affidavit dated April 12, 1995, pertained in part to the context in which the contract was written. Although a large part of that affidavit describes and explains events occurring after the making of the contract, a discrete part describes circumstances occurring before and at the time of the making of the contract. In that discrete part he describes his background in the medical service field and business, including employment with ASB Meditest, one of the top five paramedical companies in the nation providing the services of insurance physicals, blood and urine collection, and "EKGs." He describes briefly the circumstances of his coming into contact with EMSI's vice-president Bill Hutchins in August 1990, the month before the contract was made. In this regard, he describes EMSI as a paramedical examination company; he states that Hutchins called him, then came to Casper, Wyoming, to meet him and spent two days observing his operation. He states that Hutchins offered him the contract for EMSI's insurance physical services in Wyoming, and eventually Montana. He states that at that time occupational health testing was not part of any discussion he had with EMSI representatives. He states that at that time EMSI was not providing occupational health testing services in

Wyoming. He states that the contract was sent to him from EMSI's Dallas, Texas, office and that he signed it and returned it without any changes. He states that occupational health testing services "consist of everything from the collection of urine for the discovery of controlled substances in employees in occupations regulated by the Department of Transportation ("DOT") to physical examinations and testing for the protection of employees in hazardous occupations within the purview [sic] state and federal OSHA." He was not providing occupational health testing services at the time of the making of the contract, as he did not actively pursue development of that market until 1992, according to his affidavit.

On April 24, 1995, EMSI filed a response to Kirschbaum's motion. In that response, EMSI referred to certain portions of Kirschbaum's affidavit; referred to excerpts from the deposition of Ron Kindred, a friend of Kirschbaum's, pertaining to conversations the two had relating to direct billing long after the contract was made; and referred to excerpts from Utley's deposition not pertaining to the context in which the contract was written. Also in that response, EMSI contended that the parties' performance subsequent to the making of the contract constituted a modification of the contract to include occupational health testing services within the contract.

Three days later, Kirschbaum supplemented his motion with three additional exhibits of evidentiary material. Only one of those, Kirschbaum's supplemental affidavit dated April 27, 1995, pertains to the context in which the contract was written. With respect to that context, in the relevant part of the supplemental affidavit Kirschbaum states that his discussions with EMSI's Hutchins before entering into the contract "were solely with respect to insurance physicals and related services for insurance company clients, and there was no discussion whatsoever regarding occupational health testing (OHT) services." He also states, "[o]ne of the reasons I entered into the contract initially was that EMSI represented itself to have a substantial national network of insurance company clients, and established expertise in

servicing those clients, including billing of accounts and other administrative functions."

In sum, the extrinsic evidence pertaining to the context in which the contract was written, which was before the trial court and is now before this Court, consists only of those portions of Kirschbaum's two affidavits identified above. Having identified the material to be considered for summary judgment purposes, we next examine the parties' contentions about the meaning of the contract.

### 3. *The Parties' Contentions.*

#### A. *EMSI's Contentions.*

EMSI contends that the contract unambiguously covered all business and services, including occupational health testing business and services as Kirschbaum defines that phrase in his affidavit, that Kirschbaum was conducting for the five-year period after September 5, 1990, for both insurance companies and companies other than insurance companies. In support of this interpretation, EMSI points to the introductory recitals of the contract and several but, curiously, not all of the pertinent substantive subparagraphs of the contract. In combination the five recitals inform us that EMSI "is presently engaged in the business of conducting physical examinations," "has developed ... a very valuable clientele and reputation ... on a nationwide basis," and both EMSI and Kirschbaum desire that Kirschbaum "engage in the business of conducting physical examinations" using EMSI's name and systems of operations. EMSI claims that those recitals evidence the parties' intent to establish a general relationship concerning all examination and testing services to be performed. Further, EMSI claims that these recitals make it clear that EMSI's main concern is to protect its national client base and reputation concerning services provided through Kirschbaum.

Turning to the substantive provisions of the contract, EMSI draws our attention to subparagraphs 3.a., 4.b., and 4.j. Paragraph 3 is entitled *Conduct of Business by Contractor [Kirschbaum] and Remuneration.* Subparagraph 3.a. (emphasis added) provides:

a. [Kirschbaum] shall conduct *medical and paramedical examinations and surveys* through authorized, approved and duly constituted medical authority only by physicians and/or paramedical representatives at the direction and approval of the Medical Director of [EMSI] in [Wyoming]. *Such business* shall be conducted under [EMSI's name].

EMSI maintains that the terms "medical and paramedical examinations and surveys" and "such business" suggest general and broad categories of activity. EMSI notes the absence of the word "insurance" as a modifier of these terms.

Paragraph 4 of the contract is entitled *Duties and Responsibilities of Contractor [Kirschbaum].* Subparagraph 4.b. provides:

b. [Kirschbaum] shall conduct all insurance examination business, insurance inspection business, drug screening and pre-employment services in the name of [EMSI].

Referring to the types of work listed in this provision, EMSI claims that the adjective "all" which modifies those types stresses that the listed types of work carry a broad meaning. EMSI notes that the words "drug screening and pre-employment services" appear after the word "insurance"; from that word arrangement, EMSI draws the seemingly incongruous conclusion that the words "drug screening and pre-employment services" modify the term "insurance." EMSI claims that if one reads subparagraph 4.b. in the context of the entire contract, one must conclude that the parties intended the scope of the contract to embrace more than just insurance-related services. EMSI argues that the broad language of subparagraph 4.b. would be rendered meaningless if one limited the contract's scope to insurance work alone.

Subparagraph 4.j. of the contract provides:

j. [Kirschbaum] shall take all possible measures to render services which would create good will on the part of the client companies, including, but not limited to, performance of quality examinations, inspections, drug screens and pre-employment services as soon after the original

request as possible and mailing to the locations designated by the client.

Since the language "quality examinations, inspections, drug screens and pre-employment services" closely matches similar language in subparagraph 4.b., discussed earlier, EMSI's interpretation of that language closely matches its interpretation of that similar language. Thus, EMSI claims the language suggests a broad inclusive range of services and business. EMSI notes, however, a slight difference between subparagraph 4.b.'s list of work "all insurance examination business, insurance inspection business, drug screening and pre-employment services" and subparagraph 4.j.'s list of work "quality examinations, inspections, drug screens and pre-employment services" and that is the absence of the word "insurance" in the latter subparagraph. EMSI, however, does not attribute any significance to this difference, other than to opine that one would ignore subparagraph 4.j's plain meaning and render it meaningless if one limited the scope of contract services to insurance work.

In further support of its theme of interpretation that the parties' contract language evidences a broad, all-encompassing scope of services, EMSI points to the parties' frequent use of the terms "exam," "survey," "services," and "business" throughout the contract, concluding that such words have broad connotations and refer to all business that Kirschbaum may perform for EMSI during the contract term.

Finally, EMSI characterizes Kirschbaum's definition of occupational health testing services in his affidavit as a broad description of services which includes everything from drug screening and testing to examinations.

### B. *Kirschbaum's Contentions.*

Defending the trial court's interpretation of the scope of services to which the contract applies, Kirschbaum's theme of interpretation is that the meaning of the scope of services is to be determined by identifying in the contract the companies for which Kirschbaum is furnishing those services. He first observes that the introductory recitals naturally suggest the questions for whom does EMSI conduct physical examinations, for whom will Kirschbaum conduct physical examinations, and who comprise the "very valuable clientele" with whom EMSI has developed its reputation. He next identifies, in several substantive provisions of the contract, references to the companies or clientele for which his work will be performed. Specifically, he points to subparagraphs 3.b., 3.c., and 4.j. With respect to subparagraph 3.b., he notes that it contains an "approval" requirement, *i.e.*, not to "complete or bill for any exams for companies who do not approve [EMSI] or companies that [EMSI] does not approve without [EMSI's] express written consent." With respect to subparagraph 3.c., he notes another reference to that "approval" requirement in that EMSI must pay him on delinquent accounts provided he "has followed and follows [EMSI's] written instructions as to approved customers and their examination requirements and published rates." With respect to subparagraph 4.j., he observes that he is required to "take all possible measures to render services which would create good will on the part of the client companies." Asking rhetorically who are the "companies" that must approve EMSI and that EMSI must approve, who are the "approved customers" as to whom he must follow EMSI's written instructions, and who are "the client companies" with which he must create good will, he discovers the answer in subparagraphs 4.h. and 6.a. of the contract, neither of which EMSI discussed in its analysis.

Subparagraph 4.h. provides (emphasis added):

> h. [Kirschbaum] shall devote his efforts in *conducting physical examinations for insurance companies* exclusively to and for the benefit of the parties to this Contract and under the terms of this agreement, and shall not either directly or indirectly, while this agreement is in effect, engage in *conducting physical examinations and surveys for insurance companies* under any name or other than for the benefit of [EMSI], except as previously indicated. In this regard, [EMSI] shall have reasonable cause to terminate this Contract if [Kirschbaum] shall default in any of the provisions of this paragraph, or

if activities of [Kirschbaum] are such that the favorable position or good will of [EMSI] with one or more of [EMSI's] *clients* is adversely affected.

Kirschbaum contends that this specific reference to "insurance companies" readily identifies the companies referred to in the introductory recitals and the other substantive provisions of the contract.

He repeats that contention with respect to subparagraph 6.a. That provision, appearing under paragraph 6 entitled *Covenants of Company [EMSI]*, provides (emphasis added):

> a. [EMSI] shall use its best efforts to secure and maintain the *approval of all possible major insurance companies* in the contracted area [Wyoming] for the *furnishing of medical and paramedical examinations to these companies*, and [EMSI] shall furnish [Kirschbaum] these approvals.

Kirschbaum obviously finds it significant that the parties singled out "insurance companies" and failed to specifically mention companies other than insurance companies.

In addition to the contract language, Kirschbaum directs our attention to the extrinsic evidence pertaining to the context in which the contract was made. As we observed earlier in this opinion, the pertinent and relevant context evidence is found in Kirschbaum's affidavits in which he describes his background in the medical service field, the circumstances of his contact with EMSI's Bill Hutchins, the subject of his discussions with Hutchins, the nature of occupational health testing services, and EMSI's absence from the occupational health testing business in Wyoming at the time of the making of the contract. According to Kirschbaum, this context evidence confirms the plain meaning of the contract that the scope of services under the contract was limited to services for EMSI's insurance company clients.

### 4. *Our Decision.*

Having carefully considered the contract, the context evidence, and the parties' contentions, we hold that the contract with respect to the scope of services is capable of being understood in only one way and that

way is, services for EMSI's insurance company clients, as held by the trial judge. Therefore, we affirm the trial court's decision.

Having compared the parties' respective contentions, we readily find that their precise point of disagreement is, simply, for whom was Kirschbaum to provide his various services, not whether occupational health testing services were among those various services he was to provide. In his appellate brief, Kirschbaum concedes that occupational health testing services were among those services he was to furnish. EMSI claims that Kirschbaum was to provide his services, including occupational health testing, to both insurance company clients and all other companies. Kirschbaum claims that he was to provide his services, including occupational health testing, to only EMSI's insurance company clients. On this point of disagreement, we believe that Kirschbaum has the better argument.

Our reading of the contract begins with the introductory recitals. As we demonstrated in *Union Pacific Resources Co. v. Texaco*, 882 P.2d 212, 222 (Wyo.1994), in the context of a recital in a natural gas operating agreement, recitals "are frequently intended to, and often do, shed light on the circumstances the parties wished to have considered in the interpretation of the contract." 2 E. ALLEN FARNSWORTH, FARNSWORTH ON CONTRACTS § 7.10 at 258–59 (1990). Of the six recitals in the parties' contract, the first five contain language that sheds light here. Read together, these recitals inform us that the parties' purpose in contracting was to permit Kirschbaum, using EMSI's valuable name and systems of operations, to engage in EMSI's nationally reputable business of conducting physical examinations through authorized medical and paramedical personnel for a valuable national clientele. We agree with EMSI that these recitals make it clear that EMSI's main concern was to protect its national client base and reputation concerning services provided through Kirschbaum.

Turning our attention to the ten numbered substantive paragraphs of the contract, we agree with Kirschbaum's interpretive analysis that several of these substantive provi-

sions are key in identifying the valuable national clientele for which Kirschbaum was to provide services and EMSI had appropriate concern about protecting its good will. In paragraph 4, in which the parties set out Kirschbaum's duties and responsibilities, the parties expressly provided in subparagraph 4.h. that Kirschbaum was to "devote his efforts in conducting physical examinations for insurance companies exclusively to and for the benefit of the parties to this Contract and under the terms of this agreement." Significantly, EMSI's interpretive analysis ignores this provision altogether. But this Court cannot ignore this provision. We presume the parties placed that provision in this contract for a purpose. We must read that provision in the light of the other provisions; we must consider the whole contract and analyze the tenor of the complete document. Subparagraph 4.h. is specific as to insurance companies; we cannot rewrite the provision to add "and all other companies" in order to sustain EMSI's position. Our view on this point applies with equal force to the parties' additional language in subparagraph 4.h. that Kirschbaum "shall not ... engage in conducting physical examinations and surveys for insurance companies under any name or other than for the benefit of [EMSI]." Also, we find it significant that in this same subparagraph the parties wrote that EMSI would have reasonable cause to terminate the contract if Kirschbaum's "activities ... are such that the favorable position or good will of [EMSI] with one or more of [EMSI's] clients is adversely affected." The noun "clients" obviously refers to "insurance companies," the subject of the same subparagraph. Moreover, we think this subparagraph fits harmoniously with EMSI's expressed concern in the introductory recitals about protecting the reputation it had developed with its valuable national clientele.

Before leaving the subject of EMSI's concern about protecting its good will with its valuable national insurance clientele, we note that the parties referred to it again in subparagraph 4.j. There, the parties wrote that the "good will on the part of the client companies" is something that Kirschbaum must take all possible measures to create. The plain language of that provision is capable of only one reasonable meaning, *viz.*, among the measures that Kirschbaum must take to create good will on the part of the client companies are timely performance ("as soon after the original request as possible") of "quality" services and mailing to client-designated locations. Reading this language in the light of the language of the other previously noted provisions in which the parties identify insurance companies as the clientele for which services are to be furnished, we think the language "good will on the part of the client companies" refers to those previously identified "insurance companies."

Having ignored the parties' express identification of insurance companies in subparagraph 4.h., EMSI's interpretive analysis also ignores the parties' other express identification of insurance companies in subparagraph 6.a., which deals with EMSI's covenants. In that particular subparagraph, the parties wrote that EMSI shall use its best efforts to secure and maintain and furnish to Kirschbaum "the approval of all possible major insurance companies in the contracted area for the furnishing of medical and paramedical examinations to these companies." This language assumes key significance when read in light of certain language contained in subparagraphs 3.b and 3.c. In subparagraph 3.b., the parties agree that Kirschbaum "will not complete or bill for any exams for companies who do not approve [EMSI] or companies that [EMSI] does not approve without [EMSI's] express written consent." In subparagraph 3.c., the parties agree that EMSI will still pay Kirschbaum on delinquent accounts "provided [Kirschbaum] has followed and follows [EMSI's] written instructions as to approved customers and their examination requirements and published rates." Reading these several subparagraph provisions in light of each other, we find that they interrelate with respect to the "approval" requirement feature which is an important aspect of the parties' contractual relationship. We think the approved customers of subparagraph 3.c. and the approved companies of subparagraph 3.b. clearly refer to the approving insurance companies of subparagraph 6.a.

Having considered the contract as a whole, reading each part in light of the other parts, we hold that the contract unambiguously limited the scope of Kirschbaum's services to services, including occupational health testing, for EMSI's valuable national insurance company clientele. Our reading of the contract is only confirmed when we additionally consider the undisputed context evidence submitted by Kirschbaum. Although that context evidence is not crucial to our interpretation, it leaves no room for doubt.

We next address the question raised by EMSI concerning the validity of the claim of interference with contractual relationship.

*Intentional Interference With Examiner Contracts*

It was established at trial that through Kirschbaum's operation, EMSI billings grew from $5,000 per month to $60,000 per month within the next two years and the number of examiners expanded from twenty to over two hundred and fifty. As agreed, EMSI helped finance Kirschbaum's growth by providing working capital as needed and by paying him 85% of his billings every two weeks. Kirschbaum paid his examiners out of these billing revenues; and under the contract, failure to pay could constitute a default of the contract.

In 1992, Kirschbaum began performing occupational health testing services (OHT), testing industrial employees for harmful or illegal substances in their systems. Unlike drug screening in an insurance physical, this service is regulated by the Department of Transportation which requires that persons who administer such tests be certified. At first, Kirschbaum relied on EMSI to provide test scheduling, supplies, and billing, but EMSI consistently failed to properly handle its end, costing Kirschbaum clients and money. After numerous unsuccessful attempts to resolve EMSI's problems, Kirschbaum then began to direct bill his own clients through his corporation, Western Medical Services, Inc., although he continued to bill EMSI's clients through EMSI. OHT testing accounted for less than twenty percent of Kirschbaum's business.

Another series of blunders by EMSI in April of 1993 seriously jeopardized its contract with an OHT client and a laboratory client. Kirschbaum was successful in rectifying EMSI's error and used the incident to secure a mid-May meeting with EMSI's president, John Utley, in Dallas to discuss solutions to these problems. Kirschbaum expressed his excitement to EMSI that Utley was involved and now ready to act decisively. However, the incident caused Utley to fear that Kirschbaum was about to terminate their contract and join with another service bureau. Utley decided to take steps to secure Kirschbaum's network of examiners for EMSI and then terminate Kirschbaum's contract for cause which would activate Kirschbaum's covenant not to compete. On Tuesday, April 27, Utley directed EMSI's payroll department not to release any funds to Kirschbaum. Kirschbaum, unable to pay his examiners, was not told of this order when he questioned the payroll department. On Friday, April 30, Utley sent an associate vice president of EMSI to Kirschbaum's Billings, Montana, office with instructions for that office to contact Kirschbaum's examiners and tell them that Kirschbaum was no longer a part of EMSI and they should not speak with him. Kirschbaum was not informed of this activity. The EMSI vice president told the Billings' office managers that Kirschbaum's contract was going to be canceled and offered it to them. They accepted and began calling examiners to tell them of the new arrangement, asking them to stay on with them and not to return any equipment. The vice president faxed a message to Utley stating that virtually all examiners would work with EMSI because Kirschbaum owed them money. On Tuesday, May 4, Kirschbaum, concerned that he had not yet received his late-April check from EMSI, faxed a letter to EMSI's chief financial officer. He also submitted an additional $6,000 in billings. He did not receive a response to either of these communications. Later that day, an examiner called Kirschbaum and told him about her phone call from the office managers. The managers refused to explain their actions to Kirschbaum, but thirty minutes after he talked with them, Kirschbaum received a fax

from Utley, advising that his contract was being terminated for cause:

> This is to advise you that your contract with Examination Management Services, Inc., has been terminated. Your practice of handling urine collection services through Western Medical Services, Inc., rather than through Examination Management Services, Inc., and billing for those services directly constitute a breach of our agreement.

Kirschbaum immediately laid off eight of his eleven office employees. Because he was without funds to pay his network of examiners, the majority did not stay with him; by the end of the year, Kirschbaum's business had failed.

██ In Wyoming, the elements for tortious interference with a contract are: 1) the existence of a valid contractual relationship or business expectancy; 2) knowledge of the relationship or expectancy on the part of the interferer; 3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and 4) resultant damage to the party whose relationship or expectancy has been disrupted. *Toltec Watershed Imp. Dist. v. Johnston,* 717 P.2d 808, 813–14 (Wyo.1986). EMSI agrees that the jury was properly instructed at trial as follows:

> [# 23.] You are instructed that one who intentionally and improperly interferes with the performance of a contract between another and a third person by inducing or otherwise causing the third person not to perform the contract, is liable to the other for the loss resulting to the other from the failure of the third person to perform the contract.

> [# 24.] With respect to his claim for intentional interference with contracts, Defendant has the burden of proving by a preponderance of the evidence the following:

> 1. The existence of a valid contractual relationship between Defendant and a third party;

> 2. Knowledge by Plaintiff of the contractual relationship between Defendant and the third party;

> 3. Intentional and improper interference by Plaintiff, inducing or causing a breach or termination of the contractual relationship; and

> 4. Damage to Defendant as a result of the termination of the contractual relationship.

> In determining whether an issue has been proved by a preponderance of the evidence, you should consider all of the evidence bearing upon that issue, regardless of who produced it. The existence of such proposition must be more probable than its nonexistence.

> [# 25.] You are instructed that a contract which may be terminated at any time and for any reason, by either party, is nonetheless a contract which is subject to interference.

> [# 26.] With respect to Defendant's claim for intentional interference with contracts, if you find for Defendant on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate Defendant for those elements of damage proved by the evidence to have been caused by Plaintiff's interference.

> The claimed elements of damages are:

> (a) The pecuniary loss of the benefits of the contracts or business expectancies;

> (b) The emotional distress experienced by Defendant as a result of Plaintiff's conduct;

> (c) Any consequential losses caused by Plaintiff's interference.

> Whether any of these elements has been proved is for you to determine.

EMSI contends that, as a matter of law, Kirschbaum's claim for interference with contract is barred by the facts of this case because EMSI's actions were, at worst, legitimate competitive activities. Kirschbaum contends that EMSI's fair competition argument should have been made to the trial judge at the instruction conference and followed up by properly objecting to the court's instructions to the jury. He urges that EMSI's failure to preserve the record with respect to the law upon which the jury was instructed is fatal and cites to *State Farm Mutual Auto. Ins. Co. v. Shrader,* 882 P.2d

813, 831–32 (Wyo.1994). EMSI views the instructions given as proper, but asserts that where two reasonable inferences can be drawn from the evidence presented at trial, judgment should be reversed if, as a matter of law, the inference in favor of the party that did not have the burden of proof was more or at least equally probable. EMSI relies on *Murphy v. Stevens*, 645 P.2d 82, 93 (Wyo.1982), for this statement of the law. Because Kirschbaum admitted that the examiners were independent contractors and free to work for anyone they chose, EMSI asserts the evidence supports an inference that its activities were competitive which is at least equally as probable as an inference that its activities were tortiously improper and, thus, as a matter of law, Kirschbaum has failed to carry his burden of proving that EMSI's interference was improper. Although it could have, EMSI did not offer a jury instruction on the effect of competition as either an absolute right, a privilege, or an affirmative defense. *See Triton Coal Co. v. Mobil Coal Producing, Inc.*, 800 P.2d 505, 509 (Wyo.1990).

The RESTATEMENT (SECOND) OF TORTS lists a number of justifications for intentional interference with contracts for which liability will not attach. RESTATEMENT (SECOND) TORTS §§ 768–774 (1979). In an attempt to clarify when liability will attach to conduct, the Restatements were revised from the wording "justification" and "privilege" to "one who intentionally and improperly interferes." *Basin Elec. Power Co-op., Etc. v. Howton*, 603 P.2d 402, 405 (Wyo.1979); RESTATEMENT (SECOND) OF TORTS § 766 (1979). This Court decided that whether interference was improper was a question of fact for the jury and, in dicta, noted that the burden of proving sufficient justification for the interference rested with the party defending its conduct. *Basin Elec.*, 603 P.2d at 405. We held that the verdict would be viewed as the jury's acceptance of that party's version of the transaction, notwithstanding the evidence to the contrary, and our judgment would not be substituted for the jury's. *Id.* at 406.

■ The RESTATEMENT (SECOND) OF TORTS § 768 sets out the requirements for establishing whether competition constitutes proper or improper interference. *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211, 225 (Wyo.1994). If those requirements are met by the facts and circumstances of the case, EMSI's competition defense theory easily avails itself of a request to instruct the jury that its actions were not "improper" if found to be legitimate competitive activities which were carried out in a proper manner. RESTATEMENT (SECOND) OF TORTS §§ 768, 767 cmt. c (1979); *see Basin Elec.*, 603 P.2d at 405; *see Triton Coal Co.*, 800 P.2d at 511 (parties have a right and duty to offer instructions on their theory of the case and any claim of error is waived by the failure to submit a proper written instruction). Because EMSI did not request such an instruction or object to the instructions as given or otherwise point to trial court error, the issue has not been properly preserved for appeal from the order granting judgment on the verdict. *Triton Coal Co.*, 800 P.2d at 511; *Joly v. Safeway Stores, Inc.*, 502 P.2d 362, 365 (Wyo.1972); WYO. R. CIV. P. 46. EMSI's appeal from the order denying its motions for judgment as a matter of law and for a new trial on the grounds that the verdict is against the great weight of the evidence requires that we apply our standard of review for determining whether sufficient evidence supports the jury verdict. *Dellapenta v. Dellapenta*, 838 P.2d 1153, 1163 (Wyo.1992). We assume that the evidence of the prevailing party is true. We give this evidence every favorable inference and leave out of consideration any conflicting evidence of the other party. *Id.* The trial court's findings are presumed to be correct and will not be disturbed absent a showing that they are clearly erroneous, inconsistent, or contrary to the great weight of the evidence. *Id.*

■ Substantial evidence was presented enabling this jury to determine that EMSI's conduct was intentional and improper interference of the contracts between Kirschbaum and his network of independent contractors. EMSI's contract with Kirschbaum required him to hire, train, and pay the examiners, stated the territory was exclusively Kirschbaum's, and stated that Kirschbaum's failure to timely pay the examiners was cause for

termination of the contract and would trigger his covenant not to compete. Evidence was presented that EMSI knew it had breached its contract with Kirschbaum and feared he would terminate it and sign on with another billing service. By pretext, EMSI intentionally withheld the funds Kirschbaum needed to pay the examiners and, during that time, used Kirschbaum's failure to pay to not only induce the examiners to work for it, but to refuse to work for Kirschbaum. The evidence described activities undertaken by EMSI within Kirschbaum's own Billings office in order to secure the network of examiners for it. The jury could also have concluded from the evidence that EMSI's actions also were aimed at triggering Kirschbaum's covenant not to compete in order to assure he could not rebuild a network of examiners.

Absent an abuse of discretion, this Court will not overturn the trial court's decision to deny a new trial motion. The trial court has broad discretion in the matter of granting a new trial, and its action will not be disturbed on appeal unless it is clear and conclusive that there was an abuse of discretion. *Dellapenta*, 838 P.2d at 1163. Sufficient evidence supports the jury's finding on this issue. The district court exercised proper discretion in denying the new trial motion and upholding the jury verdict.

*Sufficiency of Evidence to Support Jury Award for Breach of Contract*

The jury awarded Kirschbaum $100,000 for breach of contract damages. EMSI contends that Kirschbaum proved only $41,000 dollars in contract breach damages and reversal is required.

Our standard of review for questions concerning the sufficiency of the evidence, set out above, applies here. At the close of the evidence, Kirschbaum's counsel moved to amend his pleadings to conform to the evidence with respect to damages. The motion was granted. The jury was instructed that the measure of damages for a breach of contract claim is as follows:

If you find that a contract existed between the parties and that one party breached the contract, the non-breaching party is permitted to recover those reasonably foreseeable damages that directly resulted from the breach, that is, such an amount as would place it in the condition it would have been in if the other party had adequately performed the contract, less that which is saved by the breaching party.

At trial, the jury heard evidence of several categories of damages which it may properly have awarded for breach of contract under the foregoing instruction. The parties' documents calculated the funds wrongfully withheld by EMSI to be between $41,000 and $66,000. Kirschbaum testified that he lost equipment worth $35,000 and supplies worth $14,000. He also lost a $10,000 investment in his building because he could not keep up payments after the contract was terminated. Taken together, the evidence amply supports the $100,000 awarded by the jury.

**CONCLUSION**

We affirm the partial summary judgment ruling limiting the scope of the contract to EMSI's insurance company clientele. As the finder of fact, the jury was charged with determining whether EMSI had intentionally and improperly interfered with Kirschbaum's contracts with his network of examiners. We hold that the jury's finding for Kirschbaum on that claim is supported by the evidence, and we affirm. We hold that sufficient evidence was presented to support the jury's damage award for breach of contract, and we affirm that award.

**APPENDIX A**

*CONTRACT*

STATE OF TEXAS

COUNTY OF DALLAS

WHEREAS, Company is presently engaged in the business of conducting physical examinations through authorized and paramedical personnel and

WHEREAS, Company has developed through the conduct of its business a very valuable clientele and reputation for the con-

duct of its business on a nationwide basis, and

WHEREAS, Company has developed through the conduct of its business valuable name, symbols and trademarks associated with Company's business and a unique and valuable system of operations, and

WHEREAS, Contractor desires to engage in the business of conducting physical examinations through authorized medical and paramedical personnel and to use the name, symbols and trademarks associated with Company's name, as well as Company's systems of operations,

WHEREAS, Company desires for Contractor to engage in such business under the conditions set forth herein, and

WHEREAS, Company and Contractor each expect that by entering into this Contract, and by the full and faithful observance and performance of its duties, obligations and responsibilities, that a mutually satisfactory relationship between them will be established and maintained.

NOW, THEREFORE, it is mutually agreed as follows:

1. Establishment of Contractor. Company hereby grants the Contractor under the terms and conditions set forth herein, and for the limited period of this contract, the right to use the names, symbols and trademarks associated with the Company name, and the Company's systems of operation in the City of Casaer, County of Natrona, State of Wyoming, and additional area described as follows:

all of state of Wyoming (Montana at earliest available date) not to exceed January, 1992.

2. *Term and Renewal.* The term of this contract shall be for five (5) years, commencing on the 5 day of Sept., 19 90; this Contract and the terms hereof are subject to the rights and duties of the parties stated herein and shall be governed hereby. This Contract shall automatically renew at its expiration date, provided Contractor is not then in default hereunder, unless prior to sixty (60) days before the expiration date either party shall give the other party written notice that such party will not renew this contract. It is specifically agreed that this Contract not withstanding all other provisions is terminable on an immediate basis for cause without notice and can be terminated without cause by either party with a thirty day notice in writing. Cause may include failure on the part of Contractor to develop the specific areas assigned to Contractor.

3. *Conduct of Business by Contractor and Remuneration.*

a. Contractor shall conduct medical and paramedical examinations and surveys through authorized, approved and duly constituted medical authority only by physicians and/or paramedical representatives at the direction and approval of the Medical Director of the Company in the areas above described. Such business shall be conducted under the name of "Examination Management Services, Inc."

b. At the end of each business day, Contractor shall mail to Company at Company's Home Office in Dallas, Texas, all examination vouchers (tickets) for examinations completed by Contractor prior to mailing. Contractor shall not bill any client directly, and if Contractor should receive payment direct for any examination, Contractor shall immediately foreword the entire payment received to the Company Home Office on the day of receipt. Contractor will not complete or bill for any exams for companies who do not approve Company or companies that Company does not approve without the express written consent of Company.

c. Company and Contractor agree that Contractor's remuneration shall be based on the following plan: 80% of gross revenue, manual check every two weeks until December 31, 1990.

Company shall make payment to Contractor on the normal pay days of the 15th and last day of the month for all examinations and services performed by Contractor and Contractor representatives during the normal computer cut-off periods in each pay period. It is understood that the computer

"cut-off date" will vary, but that such dates shall be established in advance and that payments to Contractor shall be based on the "computer cut-off date." Payments to Contractor shall be made on the amount billed by Company whether or not the Company has been paid. If Company has delinquent accounts, Contractor will still be paid by Company as provided in this paragraph, provided Contractor has followed and follows Company's written instructions as to approved customers and their examination requirements and published rates.

d. Contractor shall pay its examiners and representatives within a reasonable time after Contractor receives its periodic payments from Company. In the event that a dispute shall arise between Contractor and any examiner or representative which shall delay the timely payment of fees to such examiner or representative, then Contractor shall immediately notify Company of the existence of such dispute and of the withholding of payment to such examiner or representative. Any failure of Contractor to pay an examiner or representative within seven (7) days of his or her normal pay date without prior notice to Company shall constitute a default by Contractor under the terms of this Contract.

4. *Duties and Responsibilities of Contractor.*

a. Contractor may later establish a separate corporation in the state in which it is conducting business and cause such corporation to assume Contractor's obligations hereunder. However, Contractor's obligations shall not be excused or relieved as a result of the forming of such corporation or its assuming the obligations hereunder, and Contractor shall always remain primarily liable for all obligations set forth herein. Notwithstanding the foregoing, Contractor shall always contract for any liabilities in Contractor's or Contractor's corporation's name, and not in the name of the Company. Said corporation shall not utilize in its legal name the name of Examination Management Services, Inc., or any similar name, except with the express prior written consent of the Company. Contractor or Contractor's corporation may, however, use the Company name as an assumed name under the applicable local assumed name statutes. In the event Contractor causes such corporation to be formed, said corporation shall obtain authority to do business in all states in which it engages in business. Finally, if Contractor causes such a corporation to be formed, and to assume Contractor's obligations hereunder, Contractor shall first obtain approval from Company of shareholders, officers and directors of corporation. Said approval shall not be unreasonably withheld.

b. Contractor shall conduct all insurance examination business, insurance inspection business, drug screening and pre-employment services in the name of Examination Management Services, Inc.

c. Contractor shall pay all federal, state, county and municipal fees and taxes on all billings as well as other related fees, except for the percentage of fees belonging to the company.

d. Contractor shall contract for all leases and equipment, and with all employees and representatives, whether common law or independent contractor, in Contractor's own name, clearly indicating to the applicable other party the true separate business organization of the Contractor. Contractor shall not establish any accounts nor enter into any contracts whatsoever (other than with customers for services) in the name of Examination Management Services, Inc., and Contractor agrees to defend and indemnify Company and hold it harmless from any liability or action, or any damage resulting from same, including attorney's fees resulting from any contract (other than for services rendered to customers) executed or undertaken by Contractor.

e. Contractor shall be liable for his operations for the torts of its employees and agents and covenants to forever indemnify, hold harmless and defend the Company from any and all liability, costs, attorney's fees, and other damages to Company which stem from Contractor's operation or arise thereunder, whether founded in tort, contract, bankruptcy or otherwise, and Contractor covenants to maintain and carry at least $500,000 in comprehensive general liability insurance to include operations and premises coverage.

Contractor agrees to accept professional liability coverage if provided by company, through company self-funding, or coverage purchased by company through an insurance carrier, or a combination of company self-funding and insurance company coverage. Contractor agrees that company may deduct monthly cost from Contractor's pay each month. Contractor agrees that this fee may change from time to time. The deductions from Contractor shall be based upon certain services provided by Contractor to company customers. Company agrees to provide Contractor with a list of those service codes which are involved, and to update that list as changes may occur. Contractor covenants to deliver all insurance certificates of policies required by this Contract to Company prior to commencement of operation under this Contract, and further to deliver to Company all renewals and such further information with regard to said required coverage as Company shall reasonably require. Company agrees to provide certificate of coverage to Contractor of professional liability coverage.

f. Contractor shall provide services for company only in the prescribed areas and only with the systems and procedures established and approved by the Company. Contractor agrees to register and qualify in each state in which Contractor provides services.

g. Contractor shall diligently, aggressively and continuously pursue the business of conducting physical examinations through authorized medical and paramedical personnel and shall strive to ever improve its market position by doing greater numbers of examinations each year. The Company is to be furnished an application, copies of any license, certificates or other documentation as required by Company to assure that personnel representatives working for Contractor are qualified. These items are to be furnished to the Company's Home Office personnel department prior to the representative commencing work for Contractor. The Company shall have final approval of new representatives, and if the Company feels a representative should not be engaged, the Contractor will not use that representative.

Final authorization of representatives is the responsibility of the Company. All examinations qualifying as paramedical examinations shall be conducted by authorized paramedical examiners, not physicians. Contractor agrees to conduct and provide all services through qualified personnel who are approved by the company.

h. Contractor shall devote his efforts in conducting physical examinations for insurance companies exclusively to and for the benefit of the parties to this Contract and under the terms of this agreement, and shall not either directly or indirectly, while this agreement is in effect, engage in conducting physical examinations and surveys for insurance companies under any name or other than for the benefit of Examination Management Services, Inc., except as previously indicated. In this regard, Company shall have reasonable cause to terminate this Contract if Contractor shall default in any of the provisions of this paragraph, or if activities of the Contractor are such that the favorable position or good will of the Company with one or more of the Company's clients is adversely affected.

i. It is specially agreed and stipulated by the parties hereto that the type of operation contemplated by the parties in this agreement necessitates a clean, sanitary, and orderly environment at every location of the Contractor where examinations are conducted, and having this in mind, Contractor shall so maintain his or her premises. It is further specifically agreed and stipulated by the parties that the surveys and examinations contemplated within this agreement can only be conducted at the direction of licensed physicians and, therefore, Contractor specifically agrees and covenants that all paramedical personnel will be subject to and only employed after the approval of the Medical Director of Examination Management Services, Inc., who will pass on their fitness to serve. The Contractor and his or her employees specifically agree to perform examinations at the direction of the Medical Director of Examination Management Services, Inc. It is the intent of the parties here to assure themselves that no unqualified person shall be serving as a representative of the

Company. To the end that these specially agreed terms may be fulfilled, the Company shall have the right to make inspections of the Contractor's premises with reasonable frequency, and may make recommendations to Contractor regarding environment wherein examinations are conducted.

j. The Contractor shall take all possible measures to render services which would create good will on the part of the client companies, including, but not limited to, performance of quality examinations, inspections, drug screens and pre-employment services as soon after the original request as possible and mailing to the locations designated by the client.

k. The Contractor shall do all things necessary and reasonable to facilitate orderly execution of the terms of this contract.

5. *Representations of Contractor.*

a. Contractor represents that the form of its business organization, and that the names and addresses of all principals and persons interested in Contractor's business, are correctly described and enumerated on the Form of Business Addendum executed by Contractor in connection with this Contract. Contractor covenants that it will not change the form of its business organization nor suffer a change in the legal or equitable ownership of Contractor, whether by change in partners, shareholders or otherwise, and whether said change is voluntary or involuntary (other than death) without Company's express written approval, which approval Company shall not unreasonably withhold.

b. Contractor represents that the only documents or information which it has filed for public record or with any governmental, state or municipal administrative body, in which it reserves, assumes, or uses the Company names, symbols and trademarks are set forth and described on the Use of Name Addendum which Contractor has executed in connection with this contract. In the event any of the information contained on said Use of Name Addendum shall change, Contractor covenants to notify Company of such change immediately.

c. Contractor represents that this Contract does not constitute a franchise within the meaning of any local statute which would require any local or state registration. Upon request, Contractor shall furnish to Company its attorney's opinion to such effect.

d. Contractor represents that as of the time of execution of this Contract all of the representations of Contractor contained herein are true and that Contractor is not in default under any of the terms or provisions, nor has it failed to perform any of the covenants or conditions contained in this Contract.

6. *Covenants of Company.*

a. The Company Shall use its best efforts to secure and maintain the approval of all possible major insurance companies in the contracted area for the furnishing of medical and paramedical examinations to these companies and the Company shall furnish the Contractor these approvals.

b. The Company shall assist Contractor with a full range of administrative functions, including monthly billing to clients. Company shall furnish two statements a month to Contractor with a breakdown of examinations by type and intensity as done by Company for the Company's branch offices.

c. The Company shall furnish the Contractor some printing needed in the operation. This will include examination voucher forms, some paramedical forms (forms furnished to the Company by its customers), all other forms normally furnished to the Company by its customers and some other forms usually furnished to the Company's branch offices.

d. The Company shall furnish some supplies without charge, except medical supplies such as EKG paper and dipsticks which will be made available to the Contractor on a chargeback basis.

e. The Company shall make no request of the Contractor or his employees which would create liability on the part of the Contractor. The Company will not require any activity on the part of the Contractor which would be construed as the practice of medicine directly or indirectly.

f. The Company shall pay Contractor timely all monies due to Contractor under the terms of this Contract.

g. The Company covenants to do all things necessary and reasonable to facilitate the orderly execution of the terms of this Contract.

h. The Company agrees to indemnify and hold harmless Contractor from negligence on the part of the Company and its employees.

7. *Rights of Contractor, Non-assignability.*

a. Contractor understands and agrees that this Contract confers upon Contractor no proprietary right, title or interest in the name, symbols and trademarks associated with Company's name, but only the right to use the same in accordance with and during the term of this Contract. In the event of the termination of this Contract for any reason, (1) any right of Contractor to use said name, symbols and trademarks shall immediately terminate, (2) Contractor shall immediately cease to use said name, symbols and trademarks, and (3) Contractor shall immediately release or assign to Company any right or color of right which Contractor shall have or seem to have to the use or enjoyment of said name, symbols and trademarks, whether the same shall arise out of the Contract, common law, usage or otherwise.

b. The parties acknowledge that the Contractor's rights under this Contract are personal to Contractor and that Contractor may not assign, sell or convey this Contract or any of Contractor's rights granted herein.

8. *Restrictive Covenants.*

a. Contractor covenants that it shall not engage, directly or indirectly, either as an owner, employee, or agent of any other person or entity, in the medical examination business or other business similar to the company in the areas described in Paragraph 1 above, during the duration of this Contract and for a period of one (1) year following the termination of this Contract by Company for cause or as a result of the default of Contractor. The parties agree that the term and area set forth herein are reasonable. The

area specified shall be within a 75–mile radius of the area proposed under this agreement.

b. The parties agree that the restrictive covenant contained in this Paragraph 8 shall be binding upon each party and its principals, agents, officers and representatives, and that any action taken by such a person, or by any other person who has had any legal or equitable interest in Contractor or Company, shall be deemed an action of such party for purpose of this Paragraph 8.

9. *Breach of Contract.* The failure by either party to perform any covenant contained herein or the falsity of any representation contained herein shall constitute a default under the terms of this Contract. In addition to any other remedies provided by law, and in addition to any other rights of a party under this Contract, the default of a party hereunder (including the default of Contractor's corporation, which shall be attributed to Contractor) shall enable the other party to terminate the Contract, and such termination shall be consideration for cause.

10. *Miscellaneous.*

a. This Contract and the addenda mentioned herein constitute the entire agreement between the parties with regard to the subject matter. This agreement may not be amended except in writing executed by each party hereto. All notices are required to be sent by registered or certified mail addressed to the Company at its offices at 1111 W. Mockingbird Lane, 5th Floor, Dallas, Texas 75247, or at such other address as Company shall designate in writing. All notices required to be sent to the Contractor shall be sent by registered or certified mail addressed to the Contractor at 316 West Midwest Street, Casper, Wyoming 82601 or at such other address as the Contractor shall designate in writing.

b. Should any part of this agreement be found to be illegal, or in violation of public policy, or for any other reason unenforceable in law, such finding shall in no event invalidate the other parts of this agreement.

c. The parties specifically agree that this Contract is performable, at least in part, in Dallas, Dallas County, Texas, and that Texas

law bears a reasonable relationship to the rights and duties of the parties hereto. The parties therefore agree that Texas law shall govern all rights and duties under this agreement and that venue for any action arising under or by virtue of this agreement and the relationship here created shall be in Dallas County, Texas. It is further agreed that the Uniform Commercial Code, as adopted by the State of Texas, shall provide definitions where applicable and where not specifically defined otherwise in this agreement.

d. This agreement shall be binding upon and inure to the benefit of the representatives, heirs, estates, successors, and assigns of the parties hereto, but this provision shall not be construed to imply consent to any assignment prohibited by the terms of this agreement or any documents referred to herein.

e. Contractor shall comply with all federal, state and local tax laws, social security acts, unemployment compensation acts, and worker's compensation acts insofar as applicable to the performance of this Contract. Company and Contractor specifically agree that Contractor is an independent contractor as defined by law and not an employee of the Company. Contractor shall indemnify, defend and hold Company harmless against any and all damages arising as a result of Contractor's failure to comply with any federal, local, social security, unemployment compensation, or worker's compensation laws, or failure to pay any tax relating thereto.

EXECUTED THIS 5TH DAY OF SEPTEMBER, 1990.

COMPANY

EXAMINATION MANAGEMENT SERVICES, INC.

BY: /S/ [Signature]

CONTRACTOR

BY: /S/ [Signature]

### FORM OF BUSINESS ADDENDUM

This Form of Business Addendum is being completed by Contractor in connection with the execution of that one certain Contract by and between Examination Management Services, Inc., as Company and the undersigned as Contractor.

Contractor represents that the following information about its business organization is true and correct.

a. If Contractor is a sole proprietorship, state the name and residence address of the owner.

Norman Kirschbaum

409 West Birch

Glenrock, Wyoming 82637

b. If Contractor is a general or limited partnership, state the name, type and percentage of interest and residence address of each partner.

c. If Contractor is a corporation, indicate the state of incorporation and names, percentage of stock interest and residence address of each shareholder.

I hereby represent that the above information is true and correct.

X /S/ [Signature]

### USE OF NAME ADDENDUM

This Use of Name Addendum is being completed by Contractor in connection with the execution of that one certain Contract by and between Examination Management Services, Inc., as Company and the undersigned as Contractor.

Contractor represents that the only documents or information which have been filed for public record or with any governmental state or municipal administrative body in which Contractor has reserved, assumed or

used the name Examination Management Services Inc., are as follows:

Secretary of State—Wyoming

I hereby represent that the foregoing information is true and correct.

X /S/ [Signature]

## SEPARATE GUARANTY AGREEMENT

For valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned do hereby guarantee all of the obligations of Contractor under that one certain Contract by and between Examination Management Services, Inc., as Company and Norman Kirschbaum as Contractor dated the 5 day of September, 1990.

Executed this 5th day of September, 1990.

X /S/ [Signature]