POLO RANCH COMPANY; John N. Morris and Norma B. Morris; John C. Graham and Betsy M. Graham, Appellants (Defendants/Plaintiffs),

v.

CITY OF CHEYENNE, Cheyenne Board Of Public Utilities, Appellee (Plaintiff/Defendant).

No. 96–316.

Supreme Court of Wyoming.

Dec. 8, 1998.

Michael J. Sullivan and Morris Massey of Brown, Drew, Massey & Sullivan, Casper, WY; and Henry F. Bailey, Jr. of Bailey, Pickering & Stock, Cheyenne, WY. Argument presented by Mr. Sullivan, for Appellants.

J. Kent Rutledge of Lathrop & Rutledge; Gregory C. Dyekman and Matthew H. Romsa of Dray, Thomson & Dyekman, P.C., Cheyenne, WY; and Mayo Sommermeyer

and Blair J. Trautwein of Sommermeyer, Wick Dow & Campbell, Fort Collins, CO. Argument presented by Mr. Rutledge, for Appellee.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN and TAYLOR,* JJ.

LEHMAN, Chief Justice.

This case arises out of a 1955 Drilling and Water Use Agreement (Agreement) entered into between the predecessors in interest of appellant, Polo Ranch Company ("Polo Ranch" or "Ranch"), and the City of Cheyenne, Board of Public Utilities (City). For many years, the parties operated under the Agreement without problems, but in the 1970s conflicts began to surface regarding Polo Ranch's contractual entitlement to water. After several years of escalating disputes, litigation ensued, involving declaratory judgment claims, contract claims and extra-contractual claims, all related to the 1955 Agreement. Polo Ranch appeals only three of the many issues decided below. Specifically, Polo Ranch assigns as error the court's determinations regarding 1) the City's obligation to drill and explore the lands covered by the Agreement; 2) assignment of costs for backflow prevention; and 3) Polo Ranch's connections to the City's lake lines. The court's conclusions on the first and third issues are supported by the evidence and in accordance with law and are, therefore, affirmed. However, we find the court's legal conclusion regarding backflow prevention contrary to the parties' intent as expressed by the language of the contract; and on that issue, we reverse.

### ISSUES

Polo Ranch advances these issues:

I. Whether the trial court erred in its conclusion that the City did not breach the water lease, finding all of the "remaining lands" had been explored and tested by the City; that there was no obligation to drill or complete additional wells; and its interpretation of development provisions of Paragraph 4 of the water lease, such rulings being clearly erroneous, not sup-ported by substantial evidence and contrary to law. Whether the court similarly erred in its conclusion that if there was such a breach it would not be material to the positions of the parties. Having failed to fulfill its obligation, whether the City can continue to maintain the exclusive right to drill on unexplored and untested lands. Whether the water lease should be terminated as to those lands.

II. Whether the court erred in requiring Polo Ranch to pay for backflow prevention given the fact that all of the groundwater wells and appurtenant equipment are the property of the City, and the collection, distribution, and delivery system in use was designed and constructed by the City.

III. Whether, given the 40-year history of dealings between the parties, the court erred in requiring Polo Ranch to disconnect its taps from the City lake lines or to execute a written agreement formalizing the arrangement between the parties for delivery of water from the lake lines in lieu of water from the north Bell wells.

The City of Cheyenne, appellee, restates the issues in this way:

I. Did the Trial Court correctly interpret the provisions of the 1955 Agreement concerning exploration and testing of the lands subject to the Agreement, and the City's obligation to drill wells, and was there sufficient evidence to support the Trial Court's conclusions that the City complied with those provisions and, in any event, that any breach of those provisions was not detrimental to Polo Ranch?

II. Did the Trial Court correctly determine that the City could require Polo Ranch to pay for backflow prevention reasonably necessary to protect the City's water system?

III. Did the Trial Court correctly determine that the City could require Polo Ranch to disconnect from the City's lake lines or to execute a written agreement formalizing the arrangement between the parties for delivery of water from the lake lines in lieu of water from the north Bell wells?

* Chief Justice at time of oral argument; retired November 2, 1998.

## FACTS

On September 29, 1955, John H. Bell (Bell) entered into a Drilling and Water Use Agreement with the City of Cheyenne.[1] The gist of the Agreement was to give the City the exclusive right to drill for subsurface water under the lands of what is now known as Polo Ranch and to use the water produced from the Ranch, subject to delivery of a portion of the water to Bell. At the time the Agreement was entered, Bell had drilled eight wells in the Crow Creek Valley which were flowing at the surface, although none had been pumped.

The Agreement provided that the City was to drill test wells in Crow Creek Valley west of the eight flowing wells, and to complete and pump the test wells if sufficient quantities of water were present to justify development. The remainder of the lands covered by the Agreement were to be explored and tested with reasonable diligence and equipped with pumps until the area was fully tested. The City agreed to furnish Bell specified percentages of the produced water for irrigation, domestic, and stock watering purposes, and to deliver the water to Bell at the surface of the ground at the respective wells. The amount of water to be pumped is entirely within the City's discretion, but Bell is entitled to at least 43 million gallons of water each year at the City's expense. Bell is also entitled to have additional water produced, at his own expense, up to a percentage of the reasonable capacity of the field. The Agreement contains a provision which permits the City to terminate the Agreement in whole or in part if it determines that the area does not provide a feasible source of supply for its purposes. Bell has the right to terminate if production capacity is less than 155.5 million gallons in a twelve-month period, provided he gives the City notice and an opportunity to correct the deficiency.

In the two years following execution of the Agreement, the City drilled twenty-five test holes and completed ten of those wells for production. Of the ten completed wells, seven are south of the railroad tracks, in the Crow Creek Valley, and are referred to as

the south Bell wells. The three wells north of the railroad tracks are above Crow Creek, and are referred to as the north Bell wells. Shortly after the City began producing the south Bell wells, it installed pipelines, valves, and other appurtenant equipment necessary to collect the water from these wells and transport it to Cheyenne. For reasons not documented, the City asked Bell to take his water from the south Bell wells from the collection pipeline rather than at the surface of the ground at the wells, as provided by the Agreement. Similarly, in lieu of water from the north Bell wells, Bell was provided water from the City's lake line which transports surface water from west of Cheyenne. The parties acted informally under the Agreement in other respects as well; Polo Ranch received water without regard to volumetric limitations in the Agreement, and was not charged for excess water. Despite these deviations, the Agreement has never been amended, and there are no other contracts between the City and Polo Ranch that govern the respective rights and responsibilities of the parties.

The parties operated for many years under the 1955 Agreement without dispute. However, starting in the mid–1970s, after Polo Ranch had succeeded to the Bells' interest, the parties' relationship began to deteriorate. The City began billing Polo Ranch for the expenses associated with producing water in excess of Polo Ranch's free entitlement. As well efficiencies decreased, the billing costs for additional water increased and became a subject of much dispute. Over the years, Polo Ranch's water needs increased as it expanded the number of acres irrigated and began using pivot sprinklers. Although much of the municipal water supply comes from surface water, the City's demands on the Bell field also increased because the City blends its surface water with ground water to comply with federal lead and copper content restrictions. The increased water needs of both parties created added tension and conflicts. Other disagreements centered around Polo Ranch's taps on the City's lake line and potential contamination at the Ranch's cross-

1. The Agreement was also executed by Bell's wife, Ella Marie Bell, who was "joined to release

any interest she may have in the subject premises for the purposes of this agreement."

connections on the City's collection line from the south Bell wells.

The litigation in this case began in August 1990, when the City filed a complaint against Polo Ranch, seeking $6,613.47 for pumping expenses under the Agreement. Polo Ranch raised numerous affirmative defenses and filed counterclaims seeking a declaration of the parties' rights, duties and obligations under the Agreement and equitable relief. In November 1994, the City sought declaratory relief permitting the City to require Polo Ranch to disconnect from the City's water transmission system or to install a backflow prevention system at Polo Ranch's expense. Again, Polo Ranch set forth numerous affirmative defenses and counterclaims alleging breach of the covenant of good faith and fair dealing, negligent operation and maintenance of the wells, civil rights violations under § 1983, and inverse condemnation. The City subsequently amended the November complaint to include a claim for declaratory relief regarding connections to the City's lake line. A third suit, commenced by the City in December 1994, sought relief concerning access to Polo Ranch. In December 1995, Polo Ranch sued the City for, among other things, breach of the Agreement for failure to provide irrigation water. After resolving several issues by way of pre-trial motions, the district court consolidated the cases for trial.

Following a week-long bench trial starting March 25, 1996, the court resolved most of the claims in favor of the City. The court reiterated its earlier ruling that the 1955 Agreement is clear and unambiguous, supported by adequate consideration, and enforceable and binding on the parties. Relevant to this appeal, the court concluded that the City fulfilled its contractual obligations to explore and test the lands covered by the Agreement. The court determined that Polo Ranch must pay for backflow prevention reasonably necessary to prevent contamination of the City's water system. Finally, the court ruled that Polo Ranch must disconnect from the City's lake line or formalize the arrangement between the parties by way of a written agreement. Although other issues were decided by the trial court, Polo Ranch has limited its appeal to those rulings described above. Additional facts relevant to the specific issues on appeal will be set forth in our discussion.

### STANDARD OF REVIEW

The trial court entered extensive findings of fact and conclusions of law. The factual findings of a judge are subject to a broader scope of review than a jury verdict, and the appellate court may examine all of the properly admissible evidence in the record. *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 538 (Wyo.1993). However, the court's findings are presumptively correct, and will not be set aside unless they are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Id.* The court's conclusions of law are reviewed de novo. *Id.*

Our basic purpose in construing or interpreting a contract is to determine the true intent and understanding of the parties. *Examination Management Servs., Inc. v. Kirschbaum*, 927 P.2d 686, 690 (Wyo.1996); *Amoco Prod. Co. v. Stauffer Chem. Co. of Wyo.*, 612 P.2d 463, 465 (Wyo.1980). Contract construction and interpretation are done by the court as a matter of law. *Moncrief v. Louisiana Land & Exploration Co.*, 861 P.2d 516, 524 (Wyo.1993). In construing a written agreement, we must derive the meaning of the instrument from its language if the terms are clear and unambiguous. *Id.* We consider the contract as a whole, reading each part in light of all other parts. *Examination Management Servs.*, 927 P.2d at 690. Common sense and good faith are leading precepts of contract construction. *Moncrief*, 861 P.2d at 524.

We have also recognized that the language of a contract is to be construed within the context in which it was written. *Examination Management Servs.*, 927 P.2d at 690. The court may look to the surrounding circumstances, the subject matter, and the purpose of the contract to ascertain the intent of the parties at the time the agreement was made. *Id.* However, the context cannot be invoked to contradict the clear

meaning of the language used, and extraneous circumstances do not justify inserting a provision contrary to the express terms of the contract; the court cannot make a contract for the parties. *Id.*

### DISCUSSION

#### 1. Exploration, Testing, and Development

 Polo Ranch contends the City breached its obligation to explore, test and develop Ranch lands in accordance with the Agreement. As such, Polo Ranch contends that the Agreement should be terminated as to the unexplored and untested lands. The City counters that Polo Ranch never asserted a claim for termination of the Agreement and, therefore, that theory should be rejected on appeal. We have carefully reviewed the numerous pleadings and the trial transcript and we are not persuaded by the City's argument. Though perhaps the claim was not presented with the greatest clarity, especially with regard to the relief sought, the City's obligation to explore and test and its right to further explore and drill on Ranch lands have been at issue since Polo Ranch filed its initial counterclaim for declaratory judgment. The court denied the City's motion for summary judgment on the declaratory judgment, leaving the issues raised therein for trial. During trial, the matter was broached on several occasions by both parties. Finally, the court adopted the following conclusion of law from the City's proposed findings of fact and conclusions of law: "One of the contentions of Polo is that the City has failed to comply with the provisions of the 1955 Agreement concerning exploration and drilling of new wells, that paragraph 4 of the Agreement requires the City to drill at least 2 wells per year." Under these circumstances, we cannot say that the issue was not raised below. We turn, then, to the merits of the parties' arguments.

Paragraph 4 of the Agreement sets forth the City's obligations for exploration, testing and drilling. Starting in 1955, and continuing into 1956 if necessary, the City was to "drill approximately 10 test holes upon the lands of Bell covered by this agreement in the valley of Crow Creek above (westerly from) the area in which the presently flowing wells have previously been drilled." The City was then required to complete wells "in such test area and in the area where flowing wells now exist," starting no later than the summer of 1956, and to complete at least six wells before the end of 1956. After the initial drilling,

[t]he remainder of the lands covered by this agreement shall be explored and tested with reasonable diligence and thereafter with similar diligence shall be equipped with casing and pumps at a rate of not less than two wells per year, until the area has been fully tested, except to the extent that this agreement may have been terminated in whole or in part, in accordance with paragraph 11 hereof.

 During 1955 and 1956, the City drilled twenty-five test holes and completed ten of those wells for production. Thereafter, the City did no further exploration or drilling. Polo Ranch's argument rests on the premise that the activity during 1955 and 1956 fell within the City's initial drilling obligation, leaving unfulfilled the City's obligation to explore and test the "remainder of the lands." The Agreement, however, only required that approximately ten test holes be drilled in the Crow Creek Valley the first two years, and that six of those be equipped with casing and pumps. The City drilled sixteen test holes in the Crow Creek Valley; seven of those test holes were completed. In addition, nine test holes were drilled north of the Crow Creek Valley, and three of those were completed with casing and pumps (the north Bell wells). This evidence is sufficient to establish that the City's test drilling in the first two years of the Agreement extended beyond the initial drilling requirements set out in Paragraph 4.

 The plain language of Paragraph 4 requires the City to drill and explore only "until the area has been fully tested." The term "fully tested" is not defined in the Agreement. However, the trial court concluded that the City's drilling activity during 1955 and 1956 fulfilled its obligation to explore and test the remainder of the lands:

6. ... Once the City has explored and tested the remaining lands subject to the Agreement, it has no obligation to drill

additional wells. The City explored and tested the remainder of the lands covered by the Agreement when it drilled the 25 test wells shown on Exhibit 35. There is no evidence that the City was not diligent with respect to its testing and exploration, and there is no evidence that other wells would be discovered that would justify equipping and pumping.

In addition, the court concluded that Polo Ranch

> fail[ed] in its burden of proof that, *if* it was a breach of the Agreement not to drill more wells, the breach would be a material factor in the City's ability to produce water, in Polo's entitlement to more water; in short, that it would materially affect the parties' positions. The City and Polo both would be up against the safe yield of the well field and the City would have to exercise its discretion concerning how much to produce accordingly.

The City's argument, and the court's implied conclusion, is that the City's obligation to develop the water under the Ranch is limited by the safe yield of the field. The City's expert groundwater hydrologist, W. Todd Jarvis, defined "safe yield" as the amount of ground water that can be developed from an aquifer without causing trouble, for example, a drop in the water table or land subsidence which might adversely impact water quality.

The 1955 Agreement makes several references to the production capacity of the area, and to what might be said to fall within the above definition of safe yield. Paragraph 6, which sets out Polo Ranch's entitlement to water, provides for the contingency that the City may pump less water than "the proven area of the field is capable of producing without depleting the field or materially lowering the water table." That paragraph also refers to "firm production capacity of the field," "dependable annual production of the field, without depletion or material drawdown of the basic water table," "reasonable capacity" and "reasonably full firm capacity" of the field, and "reasonable firm capacity of the wells." Paragraph 10 permits Bell to terminate the Agreement "[s]hould the firm productive water capacity of the entire area as determined by the actual production from the wells and measurement of the water table" be less than 155.5 million gallons per year.

The above provisions, read together and in light of the entire contract, demonstrate the parties' intent that the water resource underlying the Ranch not be overdeveloped so as to deplete the water supply or materially draw down the water table. A reasonable construction of those provisions is that they express the understanding that the City's obligation to develop water is limited to the safe yield of the proven area of the field. That construction is consistent with the exploration and testing requirements of Paragraph 4; reasonably diligent exploration and testing would define or "prove" the area of the field.

■ Of the nine test holes drilled north of Crow Creek, six were drilled along a north-south section line to the northern perimeter of the Ranch property. The test drilling in the Crow Creek Valley did not extend to the western property boundary, but did cover four complete sections, and reached the southern boundary of the eastern sections. The six northernmost and three westernmost test holes were not completed. Jerry Mark, the current director of the Cheyenne Board of Public Utilities, testified that the reports from the drillers who drilled the test holes indicated that some of the wells did not produce sufficient quantities of water to justify completion. Others were not completed because they caused interference with the production of other wells in the Bell well field. Mr. Mark's testimony was consistent with that of Mr. Jarvis, who noted that pumping from at least one of the Bell wells interferes with other nearby wells outside the area covered by the Agreement. The court could reasonably conclude from this evidence that the City's drilling activity during 1955 and 1956 fully tested the area.

■ Polo Ranch points to Mr. Jarvis' testimony, that the nature of the aquifer is heterogeneous and may contain pockets of water, and that there are other water-bearing formations in the area, as evidence that more exploration and testing would result in more water being available, and hence, in-

crease the safe yield of the field. The language of the Agreement indicates that the parties contemplated development of the water table in which the original flowing wells were drilled. Paragraph 3 provides that "[a]ll wells drilled shall be drilled to the sands or aquifer in which the water now flowing from drilled wells was discovered." Additional evidence of that intent is found in the termination provisions of Paragraph 10, which are based in part on the "firm productive water capacity of the entire area as determined by ... measurement of the water table." The City had no obligation to seek water in other formations. Moreover, empirical data gathered from the late 1950s to the present demonstrates that the static water level in the water table underlying the Bell wells has dropped at least seven feet since 1955, and continues to decline, even at current production levels. A reasonable inference is that additional wells in the same aquifer in which the original flowing wells were drilled would not yield more water, but would further deplete the water table.

The evidence supports the court's conclusion that the area covered by the Agreement has been fully tested. As such, the court correctly determined that the City has no further obligation to explore and test under the Agreement. The Agreement makes no provision for partial termination under the circumstances present here. The court's decision on this issue is affirmed.

### 2. Backflow Prevention

Paragraph 7 of the 1955 Agreement provides that "[a]ll water to which Bell shall be entitled hereunder shall be delivered to him at the surface of the ground at the respective wells involved." At the City's request, the parties later changed the method of delivery so that Bell received water from the south Bell wells via taps connected directly to the City's distribution lines. The connections serve Polo Ranch's residences, irrigation systems and stock tanks. This arrangement worked for many years until testing in 1994 revealed unacceptable total coliform levels in the water from two of the south Bell wells, prompting a field inspection by the Environmental Protection Agency (EPA).

In a letter to the City dated August 3, 1994, the EPA notified the City that the cross-connections from the City's water transmission line to the Polo Ranch created a possibility of contamination of the City's water supply. EPA requested that the cross-connections be eliminated or backflow measures implemented by August 25, 1994, or it would consider action under § 1431 of the Safe Drinking Water Act.[2] On August 16, 1994, the City informed Polo Ranch that it must disconnect from the City's water collection system, and that Polo Ranch's entitlement would be delivered in accordance with the Agreement, "at the surface of the ground at the respective wells." To assist Polo Ranch in complying with the decision, the City installed a valve which isolated the south Bell field from the rest of the City's system, thereby allowing Polo Ranch to have exclusive use of south Bell well water on an interim basis. As of November 1994, Polo Ranch had not made arrangements to disconnect from the City's lines, and the City sought a declaratory judgment that Paragraph 7 of the 1955 Agreement was valid and enforceable, or in the alternative, that the City could require Polo Ranch to pay for backflow prevention measures.

The trial court ruled that the City is estopped from disconnecting Polo Ranch from the City's system. The court reasoned that because the City affirmatively requested a departure from the Agreement for its own benefit, it would be inequitable to now allow the City to fundamentally change the system of delivery. That decision is not before us on

---

**2.** Section 1431 of the Safe Drinking Water Act (Act) is entitled "Emergency powers," and authorizes the EPA Administrator to take action upon receipt of information that a contaminant which is present in or is likely to enter a public water system or underground source of drinking water may present an imminent and substantial endangerment to the public health. 42 U.S.C.A. § 300(i)(a) (1991). The section authorizes broad

forms of affirmative relief, and although it does not specifically state against whom such action can be taken, subsection (b) provides for civil penalties against "any person" who violates an order issued by the Administrator. 42 U.S.C.A. § 300(i)(b) (Supp.1998). The Act broadly defines "person" to include, among others, individuals, corporations, associations, and municipalities. 42 U.S.C.A. § 300f (12) (1991).

appeal. As a result, a backflow prevention system must be installed to comply with EPA requirements.[3] The key question, then, is who must bear the cost of such a system, the City or Polo Ranch?

The trial court found that the potential for contamination is directly caused by the activities and operations of the Ranch, and concluded that, since the stock watering tanks are owned and used only by Polo Ranch, Polo Ranch must pay. Polo Ranch asserts that, because the City owns the wells and the appurtenant equipment and designed and constructed the collection, distribution and delivery system currently in use, backflow prevention is the City's responsibility.

As both parties recognize, the Agreement does not specifically address the situation that has arisen, making the question of financial responsibility a difficult one to answer. Polo Ranch's use of the water for stock watering was clearly anticipated when the Agreement was entered, and the cross-connections to the Ranch's stock tanks were designed and installed by the City well over thirty years ago. The parties simply did not foresee the environmental regulation which has given rise to the dispute here. Therefore, our goal is to determine the true intent and expectations of the parties regarding allocation of costs at the time and place the Agreement was entered. *Examination Management Servs.*, 927 P.2d at 690; *see also* 2 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 7.16, at 305–06 (1990). To accomplish this, we look to the language of the contract, as well as the surrounding circumstances, the subject matter, and the purpose of the contract. *Id.*

We turn our attention first to the introductory recitals. Recitals "are frequently intended to, and often do, shed light on the circumstances the parties wished to have considered in the interpretation of the contract." *Examination Management Servs.*, 927 P.2d at 694 (quoting 2 FARNSWORTH, *supra*, § 7.10, at 258–59). The recitals state that Bell had drilled eight wells in the Crow Creek Valley which were flowing at the surface, and that Bell was presently using the water as needed for irrigating meadows. The recitals further inform us that

> Bell has refused to sell to the City for a cash consideration the water under such lands. Under such circumstances, Bell and the City desire to enter into an agreement under which the City shall have the exclusive right to drill for subsurface water under such lands and to use the water produced therefrom for the times hereinafter provided, subject to delivery of a portion of such water to Bell in accordance with the terms, limitations and conditions hereinafter contained.

Thus, the City sought a reliable source of ground water, while Bell's key purpose in contracting was to insure that he would continue to receive water.

We turn next to the substantive provisions of the Agreement. Paragraph 6, which deals with Polo Ranch's entitlement to water, is the only provision which contains language relating to the allocation of expenses. Paragraph 6 states in part:

> Bell shall be entitled to receive as full consideration for all rights and privileges hereby granted to the City, and the City

3. In addition to the federal legislation relied on by the EPA, state and local regulations are in place to guard against potential contamination of domestic water supplies. *See, e.g.*, Department of Environmental Quality, Water Quality Rules and Regulations, ch. XII, § 13(I) ("There shall be no connection between a water distribution system and any user whereby unsafe water or contamination may backflow into the system."); Code of Ordinances of the City of Cheyenne, Wyoming, § 44–35 [hereinafter Cheyenne City Code] ("[N]o cross-connections shall be permitted which, in the opinion of the Board [of Public Utilities], may contaminate the city water system. The water may be turned off to premises with cross-connections by the Board until such cross-connections are removed."); Uniform Plumbing Code, § 602.4 (incorporated into the Cheyenne City Code in Chapter 10, which sets forth building requirements) ("No plumbing fixture, devise, or construction ... shall be connected to any domestic water supply when such ... connection may provide a possibility of polluting such water supply ... unless there is provided a backflow prevention device approved for the potential hazard."). However, none of these provisions alters the contractual relationship between the City and Polo Ranch, or answers the question of who must bear the financial responsibility for backflow prevention measures.

agrees to furnish Bell *at its own expense* [4] (except as hereinafter provided), the following percentages of water produced from the area covered by this agreement. . . .

(Emphasis added.) The Agreement sets out two situations in which pumping expenses are to be paid by Bell.[5] Otherwise, the Agreement contains no language requiring expenditures of any kind from Bell.

The record also contains extrinsic evidence which pertains to the context within which the Agreement was written. It is appropriate for this court to examine such "context evidence" for the limited purpose of ascertaining the intent of the parties at the time the Agreement was made. *Examination Management Servs.*, 927 P.2d at 690. Here, the record contains typewritten "Notes on Bell Ranch Water Made for John Bell," made while the parties were negotiating the Agreement, which iterate that "[c]osts of testing, drilling, installing pumps, casing pipelines, power costs, repairs, upkeep, etc., (all expense in connection with exploration and production of water) to be at City expense."

The substantive provisions and recitals lead us to conclude the parties intended that, in exchange for giving to the City the exclusive right to drill and use the water under the Ranch, Bell would receive a certain amount of water for free. The contextual evidence is consistent with the written Agreement and confirms the parties' intent that the City would bear the expenses associated with producing water. A backflow prevention system is necessary in order for the City to meet its obligation to furnish water to Polo Ranch under the current delivery system. We can only conclude that the financial responsibility for backflow prevention, as for other expenses necessary to furnish water to the Ranch, rests with the City.

4. The Agreement consistently uses the pronouns "he" or "his" when referring to Bell, while "it" or "its" refer to the City.

5. When the field is capable of producing more than 292.5 million gallons per year and the City chooses not to produce water in excess of that amount, Bell is entitled to have what would have been his proportionate share produced at his own pumping expense. Bell is also entitled to

The court's decision that Polo Ranch must pay for backflow prevention is contrary to the intent of the parties as expressed in the language of the Agreement, and we reverse.

### 3. Lake Line Taps

■ Polo Ranch does not obtain water from the north Bell wells, but instead has seven taps in the City's lake line through which the ranch obtains raw water for stock watering. According to testimony presented at trial, the City requested that Polo Ranch take water from the lake line in lieu of water from the north Bell wells. During the course of this litigation, the City requested a declaratory judgment allowing the City to remove Polo Ranch's lake line taps or to require Polo Ranch to memorialize the arrangement in accordance with formal policies adopted by the Board of Public Utilities.

The court determined that no contractual provision entitles Polo Ranch to connect to the lake lines and that the City has no obligation to continue the present arrangement without a formal agreement. Polo Ranch argues that, because the City affirmatively requested the current delivery system, just as it affirmatively requested a deviation from the delivery system for the south Bell wells, estoppel should apply here as well.[6] Polo Ranch contends that the Court offered no reasonable explanation for treating the two situations differently. We disagree.

There are important factual differences between the two situations. Perhaps most importantly, the lake line does not contain or carry water from the Bell wells, and thus, the rights and obligations of the parties with respect to the lake line water are not governed by the 1955 Agreement. Although the evidence is undisputed that Polo Ranch takes water from the lake lines in lieu of water from the north Bell wells, the taps to the

pump water at his own expense where wells have been cased and pumping equipment installed, but the City has not yet completed collecting lines.

6. With respect to the south Bell wells, the court concluded that the City was estopped from "fundamentally chang[ing] the method of implementation upon which it insisted for its benefit."

lake lines are not metered, and the water delivered to Polo Ranch from those lines has never been included in the figures used to calculate Polo Ranch's entitlement under the Agreement. No doubt the current arrangement is beneficial to Polo Ranch, but it is outside the scope of the Agreement. The court correctly concluded that the City has no obligation to continue the arrangement.

The court's ruling on the lake line taps is affirmed.

### CONCLUSION

Faced with an Agreement that has been in existence for over forty years, major deviations from the Agreement which were not memorialized, and changes in law and circumstances, the trial court had before it a difficult task in resolving the parties' numerous disputes. The court's conclusion which assigns to Polo Ranch the costs associated with backflow prevention is contrary to the intent of the parties to the Agreement, and on that issue we reverse. In all other respects, the Judgment is affirmed.