2001 WY 39

Charles C. HOECHER and Joy
L. Hoecher, Appellants
(Plaintiffs),

v.

Robert E. RUNYAN, Appellee
(Defendant).

No. 00–156.

Supreme Court of Wyoming.

April 17, 2001.

Representing Appellant: Loyd E. Smith of
Murane & Bostwick, LLC, Cheyenne, WY.

Representing Appellee: Mark A. Bishop of
Bishop Law Office, Cheyenne, WY.

Before LEHMAN, C.J., and GOLDEN,
HILL, and KITE, JJ.

HILL, Justice.

[¶ 1]   We review a Judgment and Order of
the district court that dismissed with preju-
dice a complaint filed by the Appellants,
Charles and Joy Hoecher (Hoechers).   The
Hoechers sought to recover damages, as well
as attorney's fees, from Appellee, Robert E.
Runyan (Runyan), for breach of a real estate
sales contract.

[¶ 2]   We will reverse and remand with
directions.

## ISSUES

[¶ 3]   The Hoechers pose these issues for
our resolution:

1.   Whether the trial court erred in its
interpretation of the contract to buy and
sell real estate as a matter of law?

A) Whether, under the guise of inter-
pretation, the trial court rewrote the con-
tract and imported into the agreement
terms specifically considered and rejected
by the parties?

B) Whether the trial court erred in its
interpretation of the financing provisions
of the contract as a matter of law?

2.   Whether the trial court's legal conclu-
sion that Appellee Robert Runyan failed to
qualify for financing is correct as a matter
of law?

3.   Whether the trial court's factual con-
clusion that Appellee Robert Runyan failed
to qualify for financing is clearly errone-
ous?

4.   Whether the trial court erred as a
matter of law in its conclusion that the
Appellants waived their right to written
notice of Appellee's intention to exercise an
option to void the contract and their right

to a written letter of declination from Appellee's lender?

5. Whether the trial court erred as a matter of law in ruling that enforcing the written notice requirement would be unconscionable?

6. Whether the trial court's non-sequitur conclusion that Appellee Robert Runyan validly exercised an option to void the contract is error as a matter of law?

7. Whether Appellants, as the non-breaching parties, are entitled to their attorney fees incurred in this appeal and, upon remand, in the trial court proceedings?

Runyan provides this summary of the issues:

I. The trial court was correct in holding that Mr. Runyan's ability to obtain financing was a condition precedent to the contract.

II. The trial court was correct in finding that Mr. Runyan failed to qualify for financing.

III. The trial court was correct in finding that Mr. Runyan exercised his option to void the contract under Paragraph V.E. and that the Appellants' [*sic* ] waived their right to written notice of the seller's denial of financing and intent to void the contract.

The Hoechers identify several rebuttal issues in their reply brief:

1. Appellee misstates, mischaracterizes, and embellishes the record.

2. Appellant did not waive the issue of whether the contract is unambiguous.

3. A condition precedent cannot arise from ambiguity.

4. Impracticability is not a defense to a failure to give notice of an event that never occurred.

### FACTS

[¶ 4] The facts are not so much complicated as they are lengthy. The Hoechers set out to sell their home in Cheyenne at an advertised price of $214,500.00 without the assistance of a real estate agent. Runyan agreed to buy it. As we proceed through the mire of facts, it is helpful to begin with a recitation of the facts which the district court determined were dispositive of this matter, hence, justifying dismissal of the complaint with prejudice. The district court took note of the basic fact that the Hoechers and Runyan had entered into a contract on July 29, 1997. On June 10, 1997, Security First Bank (SFB) sent a letter to Runyan that summarized a conversation Runyan had with SFB on June 10, 1997. The letter stated that SFB would lend Runyan up to $200,000.00 under these terms:

A 5 year loan, priced at 1 year Treasury plus 300 basis points, with annual interest adjustments. Interest would be payable monthly.

A loan fee of 2% of amount financed paid by [Runyan].

The bank would lend up to 70% of appraised value of the residence purchased. Publicly traded stock, owned by [Runyan], will be pledged to the Bank in the amount equal to 30% of the loan amount financed as additional collateral.

[Runyan] will deposit an amount into the bank equal to Principal, Interest, Taxes and Insurance for one year to be held by the bank to be pledged as additional collateral.

Additional details of the proposal were eventually spelled out in a Truth–In–Lending disclosure statement. Those details included that, based on a loan amount of $217,104.10, Runyan would make one monthly payment in advance and then make 59 monthly payments of $1,565.94 beginning October 1, 1997, and then a balloon payment of $223,160.94 on September 1, 2002.

[¶ 5] This sort of loan is characterized as a portfolio loan. Once Runyan received the June 10, 1997, commitment letter, he proceeded to look for a home in Cheyenne. Runyan was aided in his search by Dawn Chymych (Agent), and the Agent was to be paid for her services by a 3% commission on the selling price of the house. Runyan made an initial offer of $207,000.00, but the Hoechers rejected that. At Runyan's suggestion, it was agreed that the Agent's commission would be paid by the Hoechers and, as consideration for that agreement, Runyan increased his offer on the home to $216,-

500.00—$210,000.00 for the house, plus $6,500.00 for the Agent's commission.

[¶ 6] The district court viewed the following provisions of the contract as important. The contract provided that Runyan made an earnest money deposit of $1,000.00, and it provided that the approximate balance of $215,500.00 was to be paid in cash, cashier's check, electronically transferred, or certified funds at closing. The district court found that the Agent had placed the balance to be paid at closing on the wrong line, and that no one noticed the mistake (the Hoechers contended that was not an "unnoticed" mistake, but exactly what the parties intended and, of course, that is precisely how the contract read). The district court also found that the Hoechers knew that Runyan was seeking unconventional financing for this real estate deal, and that they acquiesced in that method of "financing." The district court went on to rely heavily on Article V of the contract, which set out Runyan's responsibilities with respect to obtaining a loan. The closing on the property did not go as originally scheduled on August 25, 1997, and because SFB and Runyan failed to get an appraisal until August 28, 1997, the closing was rescheduled for September 2, 1997, the day after Labor Day. The appraisal valued the property at $209,000.00, *i.e.*, the real value of the home, less the Agent's commission.

[¶ 7] Because of these circumstances, SFB informed Runyan that he would have to make up for the difference by an additional pledge of stock. Runyan refused to pledge additional stock and, hence, SFB notified Runyan that the loan would be denied, though that did not occur until about a week after the scheduled September 2, 1997 closing. That letter was issued simply because Runyan refused to live up to his original agreement with SFB. The district court characterized SFB's action as changing the terms of the loan agreement and, therefore, Runyan had failed to qualify for such financing as initially was contemplated between him and SFB. By the terms of the contract, as construed by the district court, Runyan was obligated to give written notice to the Hoechers of the denial of financing, but he did not do so. The district court opted to excuse this

failure on Runyan's part because the Hoechers did receive oral notice, and by their actions, waived written notice, as well as because holding Runyan to the written notice requirement would be "unconscionable."

[¶ 8] The district court's final conclusions were that Runyan validly exercised his option to void the contract, he was entitled to the return of his earnest money deposit, and because neither party had breached the contract, attorney's fees could not be assessed as provided for in the contract. The court then dismissed the Hoechers' complaint with prejudice.

[¶ 9] We agree with the rendition of the facts set out by the Hoechers because they are clearly demonstrated in the record. Runyan decided to relocate to Cheyenne because of the favorable tax climate and low cost of living. Runyan began negotiating with SFB for a loan to buy a home, as well as to seek employment with SFB. Runyan had not identified the house he wished to buy, but sent SFB a resume and a financial statement that showed he possessed assets in the amount of $793,073.99. SFB then sent its letter of June 10, 1997, to Runyan as set out above. Although the loan was an unusual one and one not salable on the secondary market (hence, the name "portfolio loan" because it would have to remain in SFB's loan portfolio), SFB was willing to propose such a loan because Runyan was able to offer substantial collateral and because he had considerable personal wealth. Runyan then engaged the services of the Agent to help him find a home. He agreed to pay the Agent a commission of 3% of the selling price of the home. The Agent contacted the Hoechers, videotaped their home, and eventually Runyan personally viewed the property. All of Runyan's communications with the Hoechers were made through the Agent. After some negotiations, the Hoechers agreed to sell their home to Runyan for $210,000.00. However, Runyan wanted to roll the Agent's commission into the selling price of the home, so the purchase price was amended to be $216,500.00 ($210,000.00 selling price plus $6,500.00, the approximate amount of the commission to be paid to the Agent). The effect of that agreement is that Runyan

would pay $6,500.00 more to the Hoechers, and in exchange, the Hoechers would pay the $6,500.00 to the Agent from the proceeds of the sale. The end result of this arrangement is that Runyan would have to put absolutely no cash into the deal. As noted above, the signed contract stated that Runyan would pay $215,500.00 in cash or other certified funds at closing. In addition, the portion of the contract that spelled out the loan terms merely showed that the "Other" box had been checked, and all matters pertaining to the terms of any loan were crossed out.

[¶ 10] Matters became more complicated when the house appraised for $209,000.00, and, of course, the $6,500.00 commission had been added to that price. The SFB agreement was that it would lend up to 70% of the appraised value of the home, and the remainder of the purchase price would be collateralized by a margined pledge of publicly traded stock. Since SFB would only lend 70% of $209,000.00, it was necessary for Runyan to pledge additional stock to make up the remaining 30% of the loan in order to consummate the closing. Runyan refused to do this, even though SFB continued to honor its agreement with Runyan to lend him money on the terms set out in its June 10, 1997 letter.

## STANDARD OF REVIEW

[¶ 11] Our primary focus in construing or interpreting a contract is to determine the parties' intent, and our initial inquiry centers on the language of the contract. If the language of the contract is clear and unambiguous, then we secure the parties' intent from the words of the agreement as they are expressed within the four corners of the contract. *Wolter v. Equitable Resources Energy Company*, 979 P.2d 948, 951 (Wyo. 1999); *Reed v. Miles Land and Livestock Company*, 2001 WY 16, ¶ 10, 18 P.3d 1161, ¶ 10 (2001). Common sense and good faith are leading precepts of contract construction. *Polo Ranch Company v. City of Cheyenne*, 969 P.2d 132, 136 (Wyo.1998); *Reed*, ¶ 10. The interpretation and construction of contracts is a matter of law for the courts. *Mathis v. Wendling*, 962 P.2d 160, 163–64 (Wyo.1998); *Reed*, ¶ 11.

## DISCUSSION

[¶ 12] We hold that the contract to buy and sell real estate is unambiguous. Article III provides that Runyan would pay the balance due under the contract, the sum of $215,500.00, at closing, in "cash, cashier's check, electronically transferred or certified funds." Runyan bypassed the other options in Article III: To obtain a new loan (per Article IV); to assume an existing mortgage; or, to give a note and mortgage to sellers. In Article IV, Loan Terms, the only notation is that a box marked "Other" was checked. The remainder of that Article was crossed out. It would have been a simple matter to append Runyan's agreement with SFB to the contract, but that was not done. Thus, we conclude that Article IV says nothing about the contract. Since Article IV has no meaningful content, it cannot have the effect of rendering the other express terms of the contract ambiguous. Article V of the contract sets out terms relating to a loan application. We view this provision as also saying nothing about the contract. It does indicate that Runyan would complete an application with a lender within five days, but to the extent that was done, it was pro forma and merely incorporated and otherwise recognized the terms of the June 10, 1997 commitment letter issued by SFB. If Runyan simply followed through with his arrangements with SFB, then he would have had cash or certified funds at closing, as was required by the contract. Both the district court and Runyan placed heavy reliance on paragraph E., of Article V, which allowed Runyan to void the contract if he failed to qualify for financing. We have determined above that that provision of Article V is inapplicable and meaningless with respect to the interpretation of this contract. Our conclusion in this regard is buttressed by the fact that the viable terms of the contract did not include a provision that the sale was contingent on Runyan's ability to obtain suitable financing; indeed, Runyan unsuccessfully sought to renegotiate the terms of the contract, at the last minute, to include such a provision, as well as one that made the sale contingent on the house appraising at the sale price of

$216,500. We note in passing (as did the district court at trial), that an appraisal in that amount was virtually impossible since at Runyan's behest $6,500.00 had been added to the sale price so he could pay his Agent's fee without the need to come up with cash to consummate the sale. However, Runyan did not fail to qualify for financing. SFB was always willing to live up to the bargain it struck with Runyan in its June 10, 1997 letter. The only "change" was necessitated by the fact that the house appraised for only $209,000.00. As a result, the 70% of the loan that was to be secured by the home now amounted to a smaller figure than was originally contemplated when it was assumed that the house would appraise for $216,500.00. The 30% of the loan, which was to be secured by a pledge of publicly traded stock, now required an increase in the amount of stock pledged. Runyan also mixes into this argument a concern about the fact that the roof of the Hoechers' home required some repairs. It is evident from the record, and Runyan forthrightly agreed, that the condition of the roof was no impediment to the consummation of the contract as written.

[¶ 13] In summary, we hold that the contract is unambiguous and that Runyan breached the contract. It is necessary that the case be remanded to the district court to assess an award of damages in favor of the Hoechers. It is possible that we could assess damages in the context of this appeal, but we deem it preferable for that to be done by the district court, as it normally would be done. In addition, under Article XIII, the Hoechers are entitled to an award of all attorney's fees for the proceedings below, for this appeal, and for the additional proceedings required by this reversal and remand.

[¶ 14] The Judgment and Order of the district court is reversed, and the case is remanded to the district court for further proceedings consistent with this opinion.