2002 WY 106

**EAST BROADWAY ASSOCIATES, LTD., a Wyoming corporation, Appellant (Defendant),**

v.

**Terrie L. DOWELL, Appellee (Plaintiff).**

No. 01–223.

Supreme Court of Wyoming.

July 12, 2002.

Peter F. Moyer, Jackson, WY, Representing Appellant.

Kenneth S. Cohen, Jackson, WY, Representing Appellee.

Before HILL, C.J., and GOLDEN, LEHMAN,* KITE, and VOIGT, JJ.

LEHMAN, Justice.

[¶ 1] This is an appeal from a decision of the district court to enforce the sale of real property under earlier agreed upon written contract terms reached between the parties. Although we do not agree with a legal conclusion reached by the district court, we affirm the ultimate decision of the district court on a different basis.

---

* Chief Justice at time of oral argument.

1. This case was tried to the district court without a court reporter. After the district court entered its judgment and several post-trial motions were entertained, including motions regarding statements of the evidence, the district court adopted

## ISSUES

[¶ 2] Appellant East Broadway Associates, Ltd. (EBA) sets forth the following issue on appeal:

> Where a written real estate sale contract called for closing on the sale of a Jackson Hole condominium "on or before December 31, 1997" but the buyer was unable to obtain financing until November 17 of 2000, and there was no written or verbal extension agreement, was the district court empowered to order the sale of the property at the fixed 1997 contract price more than three years after the 1997 deadline based upon promissory estoppel or equitable estoppel?

Appellee Terrie L. Dowell (Dowell) phrases the issue on appeal as:

> Did the district court properly apply the principles of estoppel when it ordered appellant to sell the condominium unit to appellee at the 1997 contract price?

## FACTS[1]

[¶ 3] EBA is a Wyoming corporation owned by William and Mrs. Racow; William Racow (Racow) is president. In 1992, Dowell leased unit B–1 of the East Broadway Condominiums from EBA under a written lease agreement and paid a $1,500.00 deposit. Dowell resided in this condominium unit along with her children. After this lease expired by its terms, Dowell continued to rent unit B–1 from EBA on a verbal month-to-month tenancy basis.

[¶ 4] In March of 1994, Dowell received a letter from EBA informing each of the tenants of the condominium complex that EBA would be selling the condominium units but would first offer them for sale to the present tenants. Shortly after receiving this letter, Dowell had a conversation with Racow and advised him that she desired to purchase unit B–1. On April 26, 1994, Dowell then made a $1,000.00 earnest money deposit to EBA. The

the Statement of the Evidence filed by Dowell. This statement of facts is taken substantially from the Statement of the Evidence filed by Dowell, as well as documentation admitted into evidence by the district court at the time of trial.

parties then entered into a contract for the sale of unit B–1 on or about August 3, 1994 (1994 contract).

[¶ 5] Later that summer, Dowell had a discussion with Racow and advised EBA that she did not desire to purchase unit B–1 because there had been a double murder in that unit a couple of years earlier. However, unit B–2 had become available in the interim. Therefore, during this conversation, Racow, on behalf of EBA, suggested a method for Dowell to purchase unit B–2. This suggestion was then put into a written memorandum dated October 1994 (1994 memorandum).

[¶ 6] The 1994 memorandum contained the following language:

Terrie Dowell

PO Box . . .

Jackson WY 83001

| Date | | | | |
|------|------|------|------|------|
| 10/1/94 | sales price | $138,000.00 | | $138,000.00 |
| 10/1/94 | Escrow | ($ 1,000.00) | | $137,000.00 |
| 10/1/94 | Deposit | ($ 1,500.00) | | $135,500.00 |
| 10/1/94 | 30 years 7% WCDA | | $901.50 | $ 901.50 |
| 10/1/94 | Condo Fees | | $ 75.00 | $ 976.50 |
| 10/1/94 | Taxes | | $ 45.00 | $ 1,021.50 |
| 10/1/94 | Tax Credit | $ 62.00 | | |
| 10/1/94 | Price January 1996 | $133,500.00 | | |

[¶ 7] Later in 1994, Dowell and her children moved into unit B–2. Prior to them moving into this unit, EBA installed a downstairs bathroom and recarpeted the unit, and Dowell painted some of the interior of the condominium. However, in the summer of 1994, Dowell had just started a barber business, and she was advised by her bank that she needed to be in business for two years before the bank could make her a loan. EBA then agreed that it would hold to the $138,000.00 purchase price of unit B–2 for two years. This two-year period passed without any additional communication between the parties.

[¶ 8] Before October of 1994, Dowell paid EBA $761.50 per month for unit B–1. Beginning in October of 1994, this amount rose to $1,021.50 per month with the amount of $140.00 allocated towards the purchase of the condominium unit, $45.00 paid toward real property taxes, and $75.00 paid toward homeowner's association dues. Previously, no tenant including Dowell had paid either real property taxes or homeowner's association dues on their unit. Dowell continued to make additional payments to EBA each month since October 1994, except that the homeowner's association dues were increased in September of 1997 from $75.00 to $100.00 per month.

[¶ 9] In September of 1997, Dowell intended to apply for financing to purchase unit B–2 but was advised that she needed a contract of sale in order for her application to be considered. Therefore, EBA and Dowell entered into another written contract for the sale of unit B–2 (1997 contract). The purchase price for this transaction was set at $147,000.00 less credits/deposits leaving a net sales price of $132,300.00. This amount was calculated by giving Dowell credit for $2,500.00 in deposits and $12,200.00 in deposits from the monthly payments made by Dowell to EBA under those terms mentioned above. Closing of this transaction was set to take place on or before December 31, 1997, again subject to Dowell obtaining financing. A $1.00 earnest deposit was to be made by Dowell to EBA.

[¶ 10] After the 1997 contract was signed but before Dowell made application for financing, Dowell learned that her son needed medical treatment costing approximately $8,000.00 and notified Racow on behalf of EBA of this circumstance and that this situation would impair her ability to qualify for financing. EBA, through Racow, suggested to Dowell that she take care of her family first, words to the effect of "do what you need to do." December 31, 1997 passed by; however, neither party gave written notice to the other that the 1997 contract was terminated. Almost two years then elapsed with neither party discussing the contract. Nevertheless, Dowell continued to make monthly payments to EBA for rent, purchase of the condominium unit, taxes, and homeowner's

association dues in those amounts mentioned above. These payments were accepted by EBA.

[¶ 11] In August or September of 1999, Dowell was cutting Racow's hair and asked Racow on behalf of EBA for a payoff figure for unit B–2. Racow became upset and stated that his aunt was coming to town in the near future and it seemed silly for him (EBA) to sell the unit since this was the case. Dowell responded by reminding Racow of their earlier conversation when her son needed medical treatment. Nothing else was said concerning this issue, and Racow paid for his haircut and left.

[¶ 12] A month later Dowell telephoned Racow and asked him to meet with him. However, Racow was leaving town at the moment. Dowell asked Racow if she should be looking for a new place to live. Racow responded by saying, "No, no, I don't know what I'm doing." Dowell said that she was under the belief that she had been buying the unit for five years, and that she was not buying Racow's aunt a new dishwasher since the unit then needed a replacement dishwasher. Racow did not respond to this statement by Dowell.

[¶ 13] The Racows were gone from the area for the winter. Dowell telephoned Racow in February of 2000 and left a message on his answering machine. However, Dowell did not receive a return call from Racow. In September of 2000, Dowell again left a message for Racow. Racow returned this call that same day. Dowell asked Racow if he had thought about their last discussion. Racow responded by stating he had not thought about it at all. Later during Thanksgiving week, Dowell telephoned Racow and asked to meet with him. At a meeting held later that day, Dowell advised Racow on behalf of EBA that she had obtained financing and was now able to purchase unit B–2. Racow became angry and left the meeting.

[¶ 14] EBA, through Racow, then responded on November 22, 2000, in writing shortly after the meeting stating that EBA did not intend to sell the unit to Dowell unless she paid an additional $78,000.00, which increased the purchase price for the unit to $225,000.00 (November 22, 2000 letter). EBA also notified Dowell that unless she agreed to pay an increased rental she would be evicted on January 1, 2001. This is the first written communication received by Dowell from EBA since the parties entered into the 1997 contract.

[¶ 15] During the time period in which Dowell was making monthly payments to EBA, she intentionally did not pursue purchasing other houses because she believed she was purchasing unit B–2 even though there was an opportunity through WCDA to obtain 100% financing. Dowell also paid for numerous repairs to unit B–2 during these years without seeking reimbursement. In response, Dowell filed the instant lawsuit asking the district court to enter a declaratory judgment that Dowell had the right to purchase the unit for the original purchase price expressed within the 1997 contract.

[¶ 16] After trial, the district court entered a judgment dated March 15, 2001, ruling that the 1997 contract was clear and unambiguous and had lapsed by its terms but that EBA was estopped from asserting the 1997 contract was no longer enforceable and ordered that Dowell had thirty days to purchase the condominium unit under the terms of the 1997 contract. On April 12, 2001, Dowell paid EBA the 1997 contract purchase price amount and obtained a warranty deed for the property from EBA. This appeal followed.

### STANDARD OF REVIEW

[¶ 17] Trial of this case was held before the district court with the district court issuing specific findings of fact and conclusions of law. In its recently published case of *Hutchings v. Krachun,* 2002 WY 98, ¶ 10, 49 P.3d 176, ¶ 10 (Wyo.2002), this court reiterated our standard of review in such an instance.

The purpose of specific findings of fact is to inform the appellate court of the underlying facts supporting the trial court's conclusions of law and disposition of the issues. *Hopper v. All Pet Animal Clinic,* 861 P.2d 531, 538 (Wyo.1993). While the findings of fact made by a trial court are presumptively correct, we examine all of

the properly admissible evidence in the record. Because this court does not weigh the evidence *de novo,* findings may not be set aside because we would have reached a different result. Rather, the appellant has the burden of persuading the appellate court that the finding is erroneous. *Id.* *See also Maycock v. Maycock,* 2001 WY 103, ¶ 11, 33 P.3d 1114, ¶ 11 (Wyo.2001). Findings of fact are not set aside unless inconsistent with the evidence, clearly erroneous, or contrary to the great weight of the evidence. The definitive test of when a finding of fact is clearly erroneous is when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. A determination that a finding is against the great weight of the evidence means that a finding will be set aside even if supported by substantial evidence. *Id. See also Mathis v. Wendling,* 962 P.2d 160, 163 (Wyo.1998). **Conclusions of law made by the trial court are not binding on this court and are reviewed de novo.** *Maycock,* ¶ 12.

(Emphasis added.) This court has also recognized:

The primary purpose in interpreting or construing a contract is to determine the intent and understanding of the parties, and our initial inquiry centers on whether the language of the contract is clear and unambiguous. *Reed v. Miles Land and Livestock Co.,* 2001 WY 16, ¶ 10, 18 P.3d 1161, ¶ 10 (Wyo.2001). The interpretation and construction of a contract are done by the court as a matter of law. *Id.* Where an agreement is in writing and the language is clear and unambiguous, the parties' intent is to be secured from the four corners of the contract. *Cliff & Co., Ltd. v. Anderson,* 777 P.2d 595, 598 (Wyo.1989). We consider the contract as a whole, taking into consideration the relationship between the various parts. *Id.* "We turn to extrinsic evidence and rules of contract construction only when the contract language is ambiguous and its meaning is doubtful or uncertain." *Wolter v. Equitable Resources Energy Company, Western Region,* 979 P.2d 948, 951 (Wyo.1999).

*Whether or not a contract is ambiguous is a question of law for the court.* *Corpening v. Corpening,* 2001 WY 18, ¶ 8, 19 P.3d 514, ¶ 8 (Wyo.2001).

(Emphasis added.) *Collins v. Finnell,* 2001 WY 74, ¶ 15, 29 P.3d 93, ¶ 15 (Wyo.2001). This court has also enunciated:

Common sense and good faith are leading precepts of contract construction, and the interpretation and construction of contracts is a matter of law for the courts. *Reed [v. Miles Land and Livestock Co.,* 2001 WY 16], ¶ 10 [18 P.3d 1161, ¶ 10 (Wyo.2001) ]. We have also recognized that the language of a contract is to be construed within the context in which it was written, and the court may look to the surrounding circumstances, the subject matter, and the purpose of the contract to ascertain the intent of the parties at the time the agreement was made. *Polo Ranch Company v. City of Cheyenne,* 969 P.2d 132, 136 (Wyo.1998).

*Williams Gas Processing–Wamsutter Co. v. Union Pacific Resources Co.,* 2001 WY 57, ¶ 12, 25 P.3d 1064, ¶ 12 (Wyo.2001).

[¶ 18] Finally, this court has stated that in the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate. *Boley v. Greenough,* 2001 WY 47, ¶ 10, 22 P.3d 854, ¶ 10 (Wyo.2001) (citing *Amoco Prod. Co. v. EM Nominee Partnership Co.,* 2 P.3d 534, 539–40 (Wyo.2000) and *Burbank v. Wyodak Resources Dev. Corp.,* 11 P.3d 943, 946–47 (Wyo.2000)).

### DISCUSSION

[¶ 19] Both parties primarily focus upon arguments related to the district court's determination with respect to the principles of promissory estoppel and equitable estoppel on appeal. In addition, EBA does assert within its initial brief on appeal that the district court's ruling that the 1997 contract is clear and unambiguous and had lapsed by its terms was correct. However, while our de novo review of the 1997 contract leads us to the conclusion that the 1997 contract is clear and unambiguous, we hold that the 1997 contract did not terminate on its own

terms. Moreover, as we find our conclusion dispositive of this case, we do not address those issues raised by the parties on appeal.

■ [¶ 20] The 1997 contract, in applicable, part provides:

15. Time is of the essence hereof, and if any payment or any other condition hereof is not made, tendered or performed by either the Seller or Purchaser as hereby provided, *then this contract, at the option of the party who is not in default or breach, may at the party's option, be terminated by such party,* in which case the nondefaulting party may recover such damages as may be proper or such party may require specific performance of the other herein. In the event of such default by the Purchaser, *and the Seller elects to treat the contract as terminated,* then all payments made hereunder shall be forfeited and retained on behalf of the Seller. *In the event, however, the nonbreaching or nondefaulting party elects to treat this contract as being in full force and effect, then nothing herein shall be construed to prevent its specific performance.*

. . .

18. Each party hereto shall have the right to require specific performance of each and every provision of this Agreement as contemplated herein and may, if necessary, bring an action in a court of competent jurisdiction to compel the same.

(Emphasis added.) Thereafter, the Addendum to the 1997 contract provides in relevant part:

c. If Purchaser is not "pre-qualified" by a local institutional lender within 30 days hereafter, or if Purchaser does not actually obtain financing by the scheduled closing date, *then either party may cancel this Agreement on written notice to the other party, and Purchaser will receive a prompt refund of the earnest money.*

d. Closing will occur at the office of the local institutional lender or Teton Land Title Company in Jackson, Wyoming on or before *Dec. 31, 1997.*

(Emphasis added.) Upon review of the clear and concise language and application of our standards of review for contract interpretation, we must conclude, as did the district court, that the 1997 contract is unambiguous. Contrary to the district court, however, we also hold that the 1997 contract did not terminate automatically by its own terms.

[¶ 21] The 1997 contract clearly specifies that the termination of that contract was to be at the option of the nonbreaching or nondefaulting party, in this case EBA, and would be terminated solely upon written notice of termination being given by that party. However, EBA at no time ever advised Dowell in writing of its desire to consider the contract terminated. Indeed, EBA admits in its briefs on appeal on a number of occasions, and it is established by the facts in this case, that there were no further written communications between the parties until the November 22, 2000 letter sent by EBA to Dowell.

[¶ 22] Accordingly, we conclude that because EBA did not advise Dowell that it had elected to terminate the 1997 contract due to her breach of the terms of the contract by Dowell failing to obtain timely financing for the purchase of the condominium unit, no termination of that contract occurred. As indicated earlier, in the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate. *Boley,* 2001 WY 47, ¶ 10, 22 P.3d 854.

[¶ 23] In addition, although we have reviewed the entire 1997 contract, we do not find any other language within that contract that convinces us that the intent of the parties was anything different than that concluded above. True, while we do recognize that the contract called for closing of the contract to occur on or before December 31, 1997, we do not find that the failure to meet this closing deadline, in and of itself, mandated the automatic termination of the contract.

[¶ 24] Furthermore, whereas under the circumstances it is not necessary for the 1997 contract to be construed within the context in which it was written, the surrounding circumstances, the subject matter, and the purpose of the contract to ascertain the intent of the parties at the time the agreement was made, review of these elements solely supports our conclusion that the 1997 contract is unambiguous and did not automatically expire pursuant to its terms. The surrounding circumstances and the actions of the parties clearly evidence that it was the intent of

EBA to sell the involved condominium unit to Dowell.

[¶ 25] This unquestionable intent is gleaned upon review of the initial written offer by EBA to sell the condominium units to the current tenants residing within them, review of the wording used within the 1994 contract, EBA's two-year extension of that contract, the language used within the 1994 memorandum and the 1997 contract, Racow on behalf of EBA suggesting to Dowell that she take care of her family first inferring that Dowell take those actions that she needed to take to care for her son, and, perhaps of most significance, acceptance by EBA of the monthly payments for the purchase of the condominium unit, taxes, and homeowner's association dues over a number of years.

[¶ 26] As noted above, EBA also failed to provide written notice to Dowell of its intent to deem the 1997 contract terminated. Further, EBA failed to remit to Dowell the earnest money deposit and other payments made to EBA in conjunction with the 1997 contract. In addition, as late as the fall of 1999, Racow on behalf of EBA did not respond to Dowell's statement that she was under the belief that she had been buying the unit for five years. Finally, during this same conversation, when Dowell asked Racow if she should be looking for a new place to live, Racow responded by saying, "No, no, I don't know what I'm doing."

[¶ 27] EBA complains that it is unfair to EBA, as a Wyoming property owner, for a Wyoming court to extend a written real estate sale contract by over three years, when there was not even a verbal promise to do so, and no conduct amounting to such a promise. Further, EBA complains that enforcement of the 1997 contract through use of the application of estoppel against the statute of frauds will simply create immense uncertainty under Wyoming real estate contracts, with great incentive for lawsuits such as this one, particularly in a rising market.

[¶ 28] We point out that there was no need for a verbal promise by EBA to extend the 1997 contract as the 1997 contract was extended by the non-action of EBA to advise Dowell that it intended to treat that contract as terminated. Further, as identified above, EBA took many acts over a period of years, which substantiated that it intended to sell the condominium unit to Dowell. Additionally, our enforcement of the 1997 contract merely pursuant to its specific and explicit terms alleviates any argument regarding the statute of frauds and only serves to create certainty with respect to Wyoming real estate contracts. We have often recognized that

> [c]ourts are not free to rewrite contracts under the guise of interpretation where the contractual provisions are clear and unambiguous. [*Snyder v. Lovercheck*, 992 P.2d 1079, 1089 (Wyo.1999) ] (citing *Klutznick .v. Thulin*, 814 P.2d 1267, 1270 (Wyo. 1991)). "Accordingly, in private disputes, a court must enforce the contract as drafted by the parties and may not relieve a contracting party from anticipated or actual difficulties undertaken pursuant to the contract." *Id.*

*Kendrick v. Barker*, 2001WY 2, ¶ 18, 15 P.3d 734, ¶ 18 (Wyo.2001). It is also axiomatic that once parties formally agree to terms and a contract is formed, those parties must then abide by those plainly stated terms agreed upon. *Id.* (citing *Patel v. Harless*, 926 P.2d 963, 966 (Wyo.1996)); *see also Snyder v. Lovercheck*, 992 P.2d 1079, 1089 (Wyo.1999).

[¶ 29] Finally, EBA asserts that it is unfair to enforce the 1997 contract because such will force EBA to lose out on the increase of the price of the subject condominium unit in a severely rising real property market which has prevailed in the Jackson area over the past many years. To avoid this circumstance, EBA simply had to provide Dowell with timely written notice of its intent to deem the 1997 contract terminated and, at the same time, return those monies paid to EBA by Dowell over the many years for the anticipated purchase of the condominium.

### CONCLUSION

[¶ 30] For the reasons set forth above, we affirm the ultimate decision of the district court.